# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

RANDY BLAKE PATTERSON,       )
                                     )
          Plaintiff,         )
                                     )
v.                                   )      Case No. CIV-15-1204-HE
                                     )
NATIONAL BOARD OF MEDICAL   )
EXAMINERS,                   )
                                     )
          Defendant.      )

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

Jack S. Dawson, OBA #2235
Amy L. Alden, OBA #16978
Miller Dollarhide, P.C.
309 N.W. 9th Street
Oklahoma City, OK 73102
(405) 236-8541
(405) 235-8130 (Facsimile)
jdawson@millerdollarhide.com
aalden@millerdollarhide.com

*Attorneys for Defendant*
*National Board of Medical Examiners*

# **TABLE OF CONTENTS**

TABLE OF CONTENTS .................................................................................. i

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT   AND
    MEMORANDUM IN SUPPORT ........................................................... 1

INTRODUCTION ........................................................................................... 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ................................. 5

BACKGROUND ............................................................................................. 8

    I.     Plaintiff and his USMLE exam history ......................................... 8

    II.    The National Resident Matching Program and the 2013 Match
            Calendar ....................................................................................... 10

    III.   The USMLE Step 2 CS score reporting calendar for 2013 ......... 12

    IV.   The significance of the NRMP and USMLE calendars relative to
            Plaintiff's participation in the 2013 Match ................................. 13

ARGUMENT .................................................................................................. 13

    I.     SUMMARY JUDGMENT STANDARD ................................... 13

    II.    THE PARTIES' CONTRACT SPECIFIED PLAINTIFF'S
            EXCLUSIVE REMEDY FOR ANY ERRORS DURING EXAM
            ADMINISTRATION, AND PLAINTIFF WAS PROVIDED THAT
            REMEDY ..................................................................................... 14

    III.   THE UNDISPUTED MATERIAL FACTS ESTABLISH A
            FAILURE OF CAUSATION BETWEEN DEFENDANT'S
            ALLEGED BREACH OF CONTRACT AND PLAINTIFF'S
            CLAIMED DAMAGES. ............................................................... 17

            A.    THE TIMELINE IS FATAL TO PLAINTIFF'S CLAIMS ............ 17

            B.    PLAINTIFF'S OWN EXPERTS DO NOT TIE PLAINTIFF'S
                   FAILURE TO ACHIEVE A RESIDENCY IN THE 2013
                   MATCH TO THE FACT THAT HE DID NOT HAVE A
                   STEP 2 CS PASSING RESULT. ................................................... 18

    IV.   BECAUSE PLAINTIFF'S DAMAGES ARE SPECULATIVE, HE
            CANNOT PROVE AN ESSENTIAL ELEMENT OF HIS CAUSE
            OF ACTION. ................................................................................ 20

CONCLUSION ............................................................................................... 24

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)................................................................................13-14

*Digital Design Group, Inc. v. Info. Builders, Inc.*,
   2001 OK 21, 24 P.3d 834 (Okla. 2001) ....................................................... 17

*Drinnon v. Drinnon Constr., LLC*,
   2014 U.S. Dist. LEXIS 161765 (W.D. Okla. 2014) ..................................... 16

*DTS Tank Service, Inc. v. Vanderveen*,
   1984 OK 49, 683 P.2d 1345 (Okla. 1984) ................................................... 21

*Educational Testing Serv. v. Hildebrant*,
   923 A.2d 34 (Md. 2007)................................................................................ 14

*Florafax Int'l, Inc. v. GTE Mkt. Res., Inc.*,
   1997 OK 7, 933 P.2d 282 (Okla.1997) ......................................................... 20

*Grant v. Nat'l Bd. of Medical Examiners*,
   2009 U.S. Dist. LEXIS 43852 (N.D.N.Y. 2009) .......................................... 14

*Great Western Motor Lines, Inc. v. Cozard*,
   1966 OK 134, 417 P.2d 575 (Okla. 1966) ................................................... 21

*Harris v. Nat'l Evaluation System*,
   719 F. Supp. 1081 (N.D. Ga. 1989), *aff'd mem.*, 900 F.2d 266 (11th Cir.
   1990) ............................................................................................................. 16

*Jallali v. Nat'l Bd. of Osteopathic Med. Examiners*,
   908 N.E.2d 1168 (Ind. App. 2009) .............................................................. 14

*Langston v. ACT*,
   890 F.2d 380 (11th Cir. 1989) ..................................................................... 16

*Murray v. Educational Testing Serv.*,
   170 F.3d 514 (5th Cir. 1999) ....................................................................... 16

*San Mateo High School Dist. v. Educational Testing Serv.*,
   2013 U.S. Dist. LEXIS 124733 (N.D. Cal. 2013) ....................................... 14

*Sanjuan v. American Bd. of Psychiatry & Neurology, Inc.*,
    40 F.3d 247 (7th Cir. 1994) ........................................................................ 16

*Sims v. Taylor*,
    270 Fed. Appx. 940 (11th Cir. 2008) .......................................................... 14

*Southwest Stainless, L.P. v. Sappington*,
    582 F.3d 1176 (10th Cir. 2009) ................................................................... 20

*Whyte v. American Bd. of Physical Medicine & Rehabilitation*,
    393 F. Supp. 2d 880 (D. Minn. 2005) ......................................................... 16

**Rules and Statutes**

23 O.S. 97 .............................................................................................................. 21

23 O.S. 1991 § 21 .................................................................................................. 20

Fed. R. Civ. P. 56................................................................................................ 1, 13

## <u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u> <u>AND MEMORANDUM IN SUPPORT</u>

This is a meritless lawsuit.   Plaintiff's complaint asserts a single cause of action: breach of contract.   *See Petition* ¶¶ 15, 19 [Doc. No. 1-1].   Based upon undisputed facts, this claim is clearly barred by an exclusive-remedies provision that is part of the parties' contract.   In addition, based upon undisputed facts, Plaintiff cannot show that Defendant's alleged breach caused his claimed damages.   Finally, even if he could overcome these hurdles (and he cannot), the damages that he claims to have suffered are too speculative to be recoverable.   Defendant National Board of Medical Examiners ("NBME") therefore respectfully moves for summary judgment pursuant to Fed. R. Civ. P. 56.

## <u>INTRODUCTION</u>

NBME is a non-profit corporation whose mission is to protect the health of the public by providing a standardized system of assessment for health professionals. Together with the Federation of State Medical Boards, another non-profit entity, NBME has established the United States Medical Licensing Examination ("USMLE").   The USMLE is designed to assess a physician's ability to apply knowledge, concepts, and principles, and to demonstrate fundamental patient-centered skills, that constitute the basis of safe and effective patient care.   *See* www.usmle.org/.

There are three "Steps" to the USMLE, taken at various points in an individual's medical education process.   All of the Steps must be passed before a physician with an M.D. degree is eligible to apply for an unrestricted license to practice medicine in the United States.   *See id*.

Step 1 of the USMLE is a multiple-choice exam that assesses understanding and application of basic science concepts important to the practice of medicine. *See* www.usmle.org/step-1/. Step 2 of the USMLE has two components: Step 2 CK (Clinical Knowledge), and Step 2 CS (Clinical Skills). Step 2 CK is a multiple-choice exam that assesses the application of medical knowledge, skills, and understanding of clinical science for the provision of patient care under supervision. *See* www.usmle.org/step-2-ck. Step 2 CS uses standardized patients to assess an examinee's ability to gather information from patients, perform physical examinations, and communicate his findings. *See* www.usmle.org/step-2-cs/. Step 3 assesses whether examinees can apply medical knowledge and understanding of biomedical and clinical science essential for the unsupervised practice of medicine. *See* www.usmle.org/step-3/.

This case involves the Step 2 CS exam, for which examinees are scored on a "pass/fail" basis. As discussed further below, Plaintiff took the USMLE Step 2 CS exam on January 7, 2013. *Petition* ¶¶ 5, 6 [Doc. No. 1-1]. A very brief power outage occurred during a portion of the exam administration. *See id*. at ¶ 7. Although he completed the exam, Plaintiff contacted NBME to express his "concern that the power failure may have compromised" his exam performance. *Id*. at ¶ 8. Giving him the full benefit of the doubt, NBME concluded that the power outage might have made a difference in whether he passed Step 2 CS and therefore offered him an opportunity to retake the entire USMLE Step 2 CS examination, without paying any additional fee, as provided for in the parties' contract. Plaintiff accepted this remedy and subsequently achieved a passing result. *See id*. at ¶ 14.

2

Notwithstanding NBME's entirely reasonable handling of this matter, Plaintiff has sued the NBME.   He alleges that NBME did not arrange for him to retake the Step 2 CS exam quickly enough for his results to be available to prospective residency programs during the 2013 residency "Match" program, thereby causing him not to obtain a residency position in 2013 and resulting in a "one-year gap" in his professional training record.   *See Petition* ¶¶ 13, 15 [Doc. No. 1-1].   He further alleges that this "gap year" is the reason for his subsequent inability to obtain a residency position that he finds "acceptable."

Discovery has refuted the factual predicate for Plaintiff's claims.   To be considered for most residencies, an applicant must have passed the USMLE Step 1, Step 2 CK and Step 2 CS examinations.   At the time Plaintiff submitted his application to the National Resident Matching Program ("NRMP") in 2013, he had already ***failed*** the Step 2 **CK** exam and did not apply to retake it prior to the NRMP's required "ranking date" (*i.e.*, the date on which residency programs and participating residency candidates provide rank-order lists of their preferred candidates and programs, respectively).   He did not achieve a passing Step 2 **CK** score until October 2013, well after the conclusion of the 2013 Match.   In addition, when Plaintiff selected his ***initial*** testing date for the Step 2 **CS** exam, he chose a date (January 7, 2013) for which he knew or should have known -- from information posted on the USMLE website -- that his results would not be available for use by residency programs when preparing their Rank Order Lists for the 2013 Match.   Therefore, there are no genuine issues regarding whether the NBME's actions were the cause of Plaintiff's not obtaining a residency position in 2013.   They were not.

In all events, Plaintiff's contract claim fails for an additional reason based upon

facts that are not disputed.  Plaintiff acknowledges that his relationship with NBME is contractual.  *Petition* ¶ 5 [Doc. No. 1-1].  He also acknowledges that his claim is based upon an alleged "error in the administration" of the Step 2 CS exam.  *Id.* at ¶ 14.  The parties' contract expressly addresses such errors.  It provides "exclusive remedies" if an "an error occurs in the … administration" of the examination, pursuant to which NBME will "make reasonable efforts to correct the error, if possible, or permit [the examinee] either to retest at no additional fee or to receive a refund of the examination fee."  *See* Ex. 1, 2013 USMLE *Bulletin of Information* at p. 29.  Because the alleged error could not be "corrected" in this instance (*i.e.*, NBME could not undo the power failure or its possible impact on Plaintiff's performance), NBME allowed Plaintiff to retest at no additional fee and Plaintiff did so.  *See* Ex. 2, Letter from Proctor to Patterson dated 3/22/13; Ex. 3, Email chain between Patterson, Proctor and Gillespie dated 4/26/13; Ex. 4, Email from Gillespie to Pierson dated 4/26/13; Ex. 5, Email from Patterson to Proctor dated 8/8/2013. He has thus already received the remedy that is provided in the parties' contract, which the parties agreed would be his exclusive remedy.

Based upon these undisputed facts, NBME is entitled to judgment as a matter of law.  The Court need not even reach the additional issues raised by Plaintiff's breach-of-contract claim (*e.g.*, did the power failure actually cause Plaintiff to fail the Step 2 CS exam when he tested on January 7, 2013; if so, did the power failure constitute a force majeure event; if not, was there a breach of contract by NBME; if so, can Plaintiff show that the breach is what caused his failure to obtain a residency position in July 2013 or thereafter, or has his inability to obtain a residency resulted from Plaintiff's own inactions

and poor academic record; are Plaintiff's alleged damages too speculative to permit recovery; and did Plaintiff fail to mitigate those alleged damages).   If the Court does reach any of these other issues, they provide additional grounds for summary judgment because there are no genuine disputes relating to the material underlying facts.   Plaintiff cannot causally tie his "gap year" and claimed damages to any breach of contract by NBME.

**STATEMENT OF UNDISPUTED MATERIAL FACTS**

1.     Plaintiff Randy Patterson registered to take the Step 2 Clinical Skills ("Step 2 CS") exam on August 29, 2012.   Ex. 6 hereto, Patterson USMLE Application submitted on 8/29/2012 at 5:04:36 P.M.

2.     To register for the exam, Plaintiff was required to make the following certifications:

> **CERTIFICATION:**
>
> ┌─ **APPLICANT CERTIFICATION** ──────────────────────
> - I certify that I currently meet the USMLE eligibility requirements, i.e.,
>   ○ I am officially enrolled in or a graduate of a US or Canadian medical school program leading to the MD degree that is accredited by the Liaison Committee on Medical Education (LCME), or a US medical school program leading to the DO degree that is accredited by the American Osteopathic Association (AOA); or
>   ○ I am a graduate of an unaccredited medical school in the US or Canada and have been sponsored by a medical licensing authority to take USMLE Step 1 and 2.
> - I certify that I have read the current Bulletin of Information and Application Instructions, am familiar with their contents, and agree to abide by the policies and procedures described therein.
> - I certify that the information provided on this application is true and accurate.
>
> ☑ To indicate agreement, check box and press "SUBMIT".

Ex. 6 hereto at p. 5 (NBME 0004).

3.     Plaintiff checked the box indicating his agreement.   *Id.*

4.     The 2013 USMLE *Bulletin of Information* states, in relevant part:

5

> **Note:** USMLE makes every effort to provide that your registration information is properly processed and that the Step examinations are properly prepared, administered, and scored.  In the unlikely event that an error occurs in the preparation, processing, administration, or scoring of your USMLE examination or in the reporting of your USMLE scores, USMLE will make reasonable efforts to correct the error, if possible, or permit you either to retest at no additional fee or to receive a refund of the examination fee.  These are the exclusive remedies available to examinees for errors in the registration process; in preparing, processing, or administering exams; or in determining or reporting scores.
>
> 29

Ex. 1 hereto, 2013 *Bulletin of Information* at p. 29.

     5.      On Step 1 of the USMLE, Plaintiff scored a 188.   The minimum passing score was 190.   Ex. 7 hereto, Plaintiff's USMLE Transcript.

     6.      On December 22, 2013, Plaintiff took Step 2 CK of the USMLE.   Plaintiff failed the exam.   *Id.*

     7.      Plaintiff sat for the USMLE Step 2 CS exam on January 7, 2013.   Ex. 2 hereto, Letter from Proctor to Patterson dated March 22, 2013.

     8.      A power outage occurred while Plaintiff was taking the Step 2 CS exam on January 7, 2013.   Because the outage might have made a difference in whether Plaintiff passed Step 2 CS, Plaintiff was offered an opportunity to retake the entire USMLE Step 2 CS examination without fee, which Plaintiff accepted.   Ex. 5 hereto, Email from Patterson to Proctor dated August 8, 2013; Ex. 3 hereto, Email chain between Proctor and Patterson dated April 26, 2013; Ex. 4 hereto, Email from Gillespie to Pierson dated April 26, 2013.

     9.      According to NBME's published Score Reporting Calendar, the first date results would be reported for a Step 2 CS examination administered between January 7 and January 26, 2013, *i.e.* the Reporting Start Date, was February 27, 2013.   Ex. 8 hereto, 2013 Score Reporting Calendar.

10.    According to NBME's published Score Reporting Calendar, the last date results would be reported for a Step 2 CS examination administered between January 7 and January 26, 2013, *i.e.* the Reporting End Date, was March 20, 2013.   *Id.*

11.    Plaintiff participated in the National Resident Matching Program ("NRMP") for the first time in the 2012-2013 Match ("the 2013 Match").   Ex. 9 hereto, NRMP Applicant Report.

12.    Applicants participating in the NRMP, including Plaintiff, were required to certify their Rank Order Lists by 9:00 p.m. eastern time on February 20, 2013.   Ex. 10 hereto, Information about Rank Order Lists and NRMP Policy (24th Page).

13.    Residency programs participating in the NRMP were also required to certify their Rank Order Lists by 9:00 p.m. eastern time on February 20, 2013.   Ex. 11 hereto, *About Rank Order Lists* at p. 1.

14.    Once a Rank Order List is certified, it cannot be amended.   *Id.* at 2.

15.    In 2013, Plaintiff ranked only surgery residencies on his Rank Order List. Ex. 9 hereto, NRMP Applicant Report.

16.    Residency applicants were advised on Monday, March 11, 2013 whether they matched.   Ex. 10 hereto, 24th page.

17.    The NRMP's Supplemental Offer and Acceptance Program ("SOAP), for residency applicants who did not match in the 2013 Main Residency Match, began on March 11, 2013 and concluded on March 14, 2013 (Thursday of Match week).   *Id.*

18.    Plaintiff re-tested for the Step 2 CS component of the USMLE on August 6, 2013, at which time he passed.   Ex. 7 hereto.

19.    After failing the Step 2 CK exam the first time he tested, Plaintiff registered to retake Step 2 CK on October 10, 2013, and retested on that date, achieving a score that was just above the minimum passing score.   Ex. 7 hereto; Ex. 12, Dooley Dep. at 24:16-25:13.

## BACKGROUND

### I.    Plaintiff and his USMLE exam history

Plaintiff Randy Patterson ("Dr. Patterson") attended the University of Oklahoma College of Medicine from 2009 to the spring of 2013.   He was, at best, a mediocre student, and graduated in the bottom 25% of his class.   In addition to his decidedly undistinguished medical school record, Dr. Patterson's application for the 2013 Match included poor to marginal USMLE Step scores.

Plaintiff sat for Step 1 on June 28, 2011 and received a score of 190.   The minimum passing score at that time was 188.   Plaintiff first took the Step 2 CK exam on December 22, 2012, and achieved a failing score of 192.   Plaintiff took the Step 2 CK a second time on October 10, 2013 (well after the 2013 Match was held), and achieved a marginally passing score of 217.   Plaintiff has never registered for or taken Step 3.

As noted, this lawsuit involves the Step 2 CS exam.   Plaintiff first took the Step 2 CS in January 2013.   The crux of his complaint is that, because of events that occurred in connection with that exam administration, there is a "one-year gap" in his professional training record that prevented him from obtaining an "acceptable" residency.   *See Petition* at ¶¶ 12-13, 16 [Doc. No. 1-1].   Plaintiff does not attribute his failure to obtain a residency in the 2013 Match to his own subpar credentials, or to decisions he made regarding when

8

he would initially take the Step 2 CS exam, or to his failing the Step 2 CK exam when he first tested and then deciding not to retake the Step 2 CK exam until after the 2013 Match was held.   *See* Ex. 13, Patterson Dep. at 27:19-24.   Rather, he attributes that failure to NBME's actions, accusing NBME of not arranging for him to retake the Step 2 **CS** exam in time for him to have a passing result when he participated in the 2013 residency Match. *Petition* at ¶¶ 10, 11, 12, 15, 16 [Doc. No. 1-1].

The Step 2 CS exam is administered each year at six centers located in five major cities around the country.   Examinees are provided a one-year period upon application to schedule, cancel and reschedule their examination appointments using an online system.

Step 2 CS requires the examinee to interact with individuals trained to portray various medical conditions, just as the examinee would when encountering real patients. After each examination with a "patient," the examinee completes a patient note recording pertinent history and physical examination findings, diagnostic impressions and plan for further evaluation.   The notes are entered by the examinee into a computer at the test location site.   There are 12 patient encounters during the exam.

Dr. Patterson sat for Step 2 CS on January 7, 2013, in Los Angeles, California. During his exam, there was a power outage in the entire building.   It lasted less than one second and occurred during the note-writing portion of the 10th patient encounter.   Ex. 14, Email from Blalog to Convery dated 2/25/13.   The outage caused the computers to briefly shut down and restart.   An announcement was made for the examinees to continue hand-writing the note where they had left off on the computer.   Unfortunately, the data which had been entered by examinees prior to the power outage – for the 10th encounter

only – could not be recovered.

Nineteen examinees sat for the Step 2 CS exam in Los Angeles on January 7, 2013, including the Plaintiff.   Seventeen of them passed the Step 2 CS, notwithstanding the loss of data from the power outage.   Plaintiff was not one of those seventeen individuals.

In accordance with standard procedures, NBME reviewed Plaintiff's exam results to see whether he might have passed but for the power outage that occurred during the 10th patient encounter.   If scored on the basis of the remaining encounters only, he would have earned a **failing** Step 2 CS score for his performance.   However, *assuming* he would have received a perfect patient note score for the 10th encounter (which he had not done on any of the other 11 patient encounters), Plaintiff would have passed the Step 2 CS.   NBME therefore gave Plaintiff the benefit of the doubt and offered him a free re-test, as provided in the parties' contract.   Plaintiff retested and achieved a passing result.   His failing performance on the January 7 Step 2 CS exam was expunged from his USMLE transcript.

## II.   The National Resident Matching Program and the 2013 Match Calendar

Dr. Patterson participated in the National Resident Matching Program ("NRMP") for the first time during the 2012-2013 Main Residency Match ("the Match").   The Match is the selection process by which eligible applicants and participating residency programs rank one another, and by which residency positions are filled in the United States.

Senior medical students in the U.S. typically begin the residency application process at the beginning of their final year in medical school.   After they apply to residency programs, the programs review applications and invite selected candidates for interviews that are held in the fall and early winter.   Once the interview period is over,

applicants and the programs create Rank Order Lists ("ROLs").   Programs rank applicants in order of preference, and applicants compile their lists of preferred programs based upon a variety of factors including medical specialty and program location.   The NRMP then applies an algorithm to the ROLs that pairs the preferences of applicants with the preferences of the residency programs to see if there are any matches.

On a given Monday in March of each year, applicants learn whether they matched with any residency programs.   This begins what is referred to as "Match week."   As part of Match week, applicants who did not match with a program may participate in the NRMP's Supplemental Offer and Acceptance Program ("SOAP") to try to obtain an unfilled residency position.   On Monday of Match week they are provided access to a List of Unfilled Programs and, within a few hours, they are permitted to start sending applications to the Electronic Residency Application Service ("ERAS"), a centralized online application service administered by the Association of American Medical Colleges. Residency programs with unfilled positions can begin viewing SOAP applications and contacting applicants shortly thereafter.   The programs then begin creating SOAP preference lists, and applicants in whom residency programs are interested begin receiving electronic offers through the NRMP system.   Applicants who receive offers have two hours to accept or reject the offered position.   Positions rejected by applicants are not offered to other potential candidates until the start of the next SOAP offer round. Assuming unfilled positions remain, the SOAP rounds repeat until Thursday of Match week, which is the day before Match results are publicly announced.   The results of the Residency Match and the SOAP matches are announced on Friday of Match week.

For 2013, the NRMP published the following pertinent deadlines:

| | |
|---|---|
| **February 20, 2013** | Ranking closed and ROLs were required to be certified by 9:00 p.m. |
| **Monday, March 11, 2013** | Match week began; applicants who did not match were notified that they did not match, and the SOAP began. |
| **Thursday, March 14, 2013** | The SOAP matching process concluded. |
| **Friday, March 15, 2013** | The results of the Match (both Main Residency Match and SOAP) were made public at 1:00 p.m. |

## III.   The USMLE Step 2 CS score reporting calendar for 2013

Just as the NRMP publishes a calendar of dates for each year's Match, the NBME publishes a Score Reporting Schedule for each year well in advance of the testing dates. The 2013 Score Reporting Schedule for the Step 2 CS exam was posted on the USMLE website on June 21, 2012, and advised examinees of the following score reporting dates:

| **Testing Period** | **Reporting Start Date** | **Reporting End Date** |
|---|---|---|
| January 1 - January 26 | February 27 | March 20 |
| January 27 - March 23 | April 24 | May 22 |

Based upon this calendar, Step 2 CS examinees who registered to test between January 1 and January 26, 2013, would know that their results would not be reported any earlier than February 27, 2013, and might be reported as late as March 20, 2013.

IV.    **The significance of the NRMP and USMLE calendars relative to Plaintiff's participation in the 2013 Match**

Even assuming a best-case scenario in which Plaintiff had been able to register to retake the Step 2 CS examination as early as January 8, 2013 (the day after the power outage that occurred during his first Step 2 CS attempt), the calendars set forth above show that Plaintiff still would not have received a Step 2 CS score in time to have it considered by residency programs when preparing their Rank Order Lists for the 2013 Match.   Based upon the NBME's and NRMP's published calendars, Plaintiff could not have expected to receive his Step 2 CS result for a January 8th test date – at the earliest – until February 27, 2013, a week *after* residency programs and residency applicants were required to irrevocably certify their Rank Order Lists.   Furthermore, based upon the published calendar for Step 2 CS score reporting in 2013, Plaintiff knew that he might not receive his Step 2 CS exam results for his actual test date of January 7, 2013 until March 20, 2013 – 6 days *after* the conclusion of the 2013 Match week (regular and SOAP) and 5 days *after* the 2013 residency matches were publicly announced.

## ARGUMENT

I.    **SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.   *See* Fed. R. Civ. P. 56.   If the evidence is "so one-sided that one party must prevail as a matter of law," the court should grant summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986).   Although a court must view the evidence in a light most favorable to the

13

non-moving party, the "mere existence of a scintilla of evidence," conclusory allegations, speculations, and unsubstantiated assertions cannot defeat summary judgment. *Id.* at 252. Only evidence on which a jury could "reasonably" find for the non-moving party may justify the denial of summary judgment.  *Id.*

## II.   THE PARTIES' CONTRACT SPECIFIED PLAINTIFF'S EXCLUSIVE REMEDY FOR ANY ERRORS DURING EXAM ADMINISTRATION, AND PLAINTIFF WAS PROVIDED THAT REMEDY

The relationship between a testing entity and an examinee is contractual.  The terms of the contract are provided in the testing bulletin and/or in online policies and procedures to which the testing entity and the examinee agree.[1]   Plaintiff does not suggest otherwise.   To the contrary, his sole claim is for breach of contract, and, in answer to an interrogatory, he has asserted that NBME did not "meet its obligations outlined in the 2013 *Bulletin of Information* …."   Ex. 15, Plaintiff's Answers to First Interrogatories (Interrogatory No. 9).   It is therefore appropriate for the Court to apply the 2013 USMLE *Bulletin of Information* in resolving this case.  *See also Grant v. Nat'l Bd. of Medical Examiners*, 2009 U.S. Dist. LEXIS 43852, *16-17 (N.D.N.Y. 2009) ("The USMLE *Bulletin of Information* formed the basis for the contract between Plaintiff, as test taker,

---

1 *See, e.g., Sims v. Taylor*, 270 Fed. Appx. 940, 944-45 (11th Cir. 2008) (examinee bound by requirements found in the testing bulletin for his teacher licensing exam); *San Mateo High School Dist. v. Educational Testing Serv.,* 2013 U.S. Dist. LEXIS 124733, *25-31 (N.D. Cal. 2013) (applying terms from testing bulletin); *Jallali v. Nat'l Bd. of Osteopathic Med. Examiners*, 908 N.E.2d 1168, 1173 (Ind. App. 2009) (examinee bound by a choice-of-law and confidentiality provisions contained in the online testing terms and conditions to which he agreed when he registered to test); *Educational Testing Serv. v. Hildebrant*, 923 A.2d 34, 43 (Md. 2007) (affirming summary judgment for testing entity on plaintiff's breach of contract claim, where the testing entity followed the procedure set forth in its testing Bulletin and plaintiff had "signed a certification statement indicating that she agreed to the conditions set forth in the Bulletin").

and NBME....").

The 2013 USMLE *Bulletin of Information* states, in relevant part, as follows:

> **Note**:   USMLE makes every effort to provide that your registration information is properly processed and that the Step examinations are properly prepared, administered, and scored.   In the unlikely event that an error occurs in the … administration, or scoring of your USMLE examination …, USMLE will make reasonable efforts to correct the error, if possible, or permit you either to retest at no additional fee or to receive a refund of the examination fee. **These are the exclusive remedies available to examinees for errors in the … administering exams; or in determining or reporting scores.**

Ex. 1, 2013 USMLE *Bulletin of Information* at p. 29 (emphasis added).   When he registered to take the Step 2 CS exam, Plaintiff certified that he had read the *Bulletin of Information* and he "agree[d] to abide by the policies and procedures described therein." Ex. 6 at p. 5 (NBME 0004).

Plaintiff's breach-of-contract claim is based upon an alleged "error in the administration of the Step 2 examination," resulting from a power outage that occurred when he tested.   *Petition* at ¶¶ 5-8, 14 [Doc. No. 1-1].   As noted above, the "exclusive remedies" for such test administration errors are provided for in the USMLE *Bulletin of Information*:   "reasonable efforts [by NBME] to correct the error, if possible, or [permitting him] either to retest at no additional fee or to receive a refund of the examination fee."   In accordance with this provision, NBME offered to re-test Plaintiff at no additional fee.   He accepted that remedy and subsequently re-took the Step 2 CS exam at no additional cost.   That should have been the end of the matter.

As noted above, courts look to the terms found in testing bulletins when deciding

disputes between examinees and testing entities.[2]   This includes provisions similar to the

exclusive-remedies provision in the USMLE *Bulletin of Information,*[3] as well as

provisions that foreclose court claims all together.[4]   While we have not located a directly

analogous case from Oklahoma, Oklahoma courts likewise enforce contractual provisions

that provide for exclusive remedies in the event of an alleged contract breach.[5]

Here, it is undisputed that the parties' contract includes provisions found in the 2013

USMLE *Bulletin of Information.*   Dr. Patterson agreed to abide by those terms, one of

which expressly addresses NBME's obligations to Dr. Patterson in the event of any error in

the administration of his Step 2 CS exam.   The contract required NBME to provide Dr.

Patterson with a free re-test if he wanted to re-test, and it did so.   Plaintiff has therefore

received the remedy which he agreed to accept as his exclusive remedy for any errors in

test administration, and NBME is entitled to judgment as a matter of law.

---

2   *See also Murray v. Educational Testing Serv.*, 170 F.3d 514, 516-17 (5th Cir. 1999); *Langston v. ACT*, 890 F.2d 380, 385-87 (11th Cir. 1989).

3   *See, e.g.*, *Harris v. Nat'l Evaluation System,* 719 F. Supp. 1081, 1082 (N.D. Ga. 1989) (examinee bound by a provision that limited the remedies available if the testing entity failed to provide "adequate administration conditions" to "score correction or test retake at no additional fee"), *aff'd mem.*, 900 F.2d 266 (11th Cir. 1990).

4   *See, e.g., Sanjuan v. American Bd. of Psychiatry & Neurology, Inc.,* 40 F.3d 247 (7th Cir. 1994) (enforcing provision which released the Board from all claims relating to "the grade or grades given with respect to the oral or written examinations" administered by the Board); *Whyte v. American Bd. of Physical Medicine & Rehabilitation,* 393 F. Supp. 2d 880, 888-90 (D. Minn. 2005) (holding that waiver-and-release provision in plaintiff's exam application barred his due process and contract claims).

5   *See, e.g., Drinnon v. Drinnon Constr., LLC,* 2014 U.S. Dist. LEXIS 161765, *5 (W.D. Okla. 2014) (enforcing provision in contract which stated that arbitration "shall be the sole and exclusive remedy of the parties" in the event of any disputes under the contract).

### III.   THE UNDISPUTED MATERIAL FACTS ESTABLISH A FAILURE OF CAUSATION BETWEEN DEFENDANT'S ALLEGED BREACH OF CONTRACT AND PLAINTIFF'S CLAIMED DAMAGES.

To recover on a breach-of-contract theory in Oklahoma, a plaintiff must prove: (1) formation of a contract; (2) breach of the contract; and (3) damages *as a direct result of the breach*.   *Digital Design Group, Inc. v. Info. Builders, Inc.*, 2001 OK 21, ¶ 33, 24 P.3d 834, 843 (Okla. 2001) (emphasis supplied).   Here, there exists no genuine issue of material fact as to whether the damages allegedly suffered by Dr. Patterson were a "direct result" of the alleged breach of contract by NBME.   Undisputable facts show that they were not.

### A.   THE TIMELINE IS FATAL TO PLAINTIFF'S CLAIMS.

Plaintiff claims that he was unable to begin residency training in July 2013 because NBME unreasonably delayed the scheduling of his re-test on the Step 2 CS exam. *Petition* ¶ 12 [Doc. No. 1-1].   However, residency applicants and residency programs were required to *irrevocably* rank each other by 9:00 p.m. on February 20, 2013 – one week *before* the earliest date on which Dr. Patterson could have expected to have his Step 2 CS score reported from the January 7, 2013 test administration, as made clear to him in advance of testing by NBME's published Score Reporting Calendar.   Therefore, Plaintiff's Step 2 CS result for the January 7, 2013 administration was never going to be reported in time to be considered by residency programs in the 2013 Main Residency Match.

Plaintiff made the decision to wait until January 7, 2013 to first take the Step 2 CS exam.   Based upon published information, he knew or should have known he could not expect to receive his test results until *after* both he and the residency programs irrevocably

certified their Rank Order Lists.   Thus, regardless of the power outage or whether NBME should have arranged for him to re-test sooner, residency programs would not have had Dr. Patterson's Step 2 CS results to evaluate at the time they ranked residency candidates in the 2013 Match, and NBME had no obligation in any event to report Plaintiff's results on the January 7, 2013 Step 2 CS exam to him prior to the conclusion of the 2013 Match.

> **B.     PLAINTIFF'S OWN EXPERTS DO NOT TIE PLAINTIFF'S FAILURE TO ACHIEVE A RESIDENCY IN THE 2013 MATCH TO THE FACT THAT HE DID NOT HAVE A STEP 2 CS PASSING RESULT.**

Plaintiff's own experts, Drs. Dooley and Jones, testified they could not tie Plaintiff's failure to achieve a residency position in 2013 to the fact that he did not have a passing Step 2 CS result when he participated in the 2013 Match.   Rather, they attribute his failure to match into a residency in 2013 to a variety of factors, including (1) his poor grades and low class rank (4th quartile), (2) his poor Step 1 score, (3) his failing Step 2 CK score at the time of the 2013 Match and his later, marginal Step 2 CK score, (4) Dr. Patterson's decision, contrary to the advice of Drs. Dooley and Jones, to apply to top-tier surgical programs that Patterson's poor academic performance could not support,[6] and (5) Dr. Patterson's failure to engage in activities reflecting outstanding achievement to overcome the significant barriers created by his poor grades and board scores.   Ex. 12, Dooley Dep. at 23:6-27:4; 30:2-31:23; Ex. 16, Jones Dep. at 14:21-15:21; 18:15-29:25.

---

6   Indeed, Dr. Dooley suggested to Dr. Patterson that he consider applying to residency programs which either were on probation or coming off of probation, because the more competitive candidates would not be interested in such programs.   Ex. 12, Dooley Dep. at 13:13-14:10; 30:17-31:4.

Plaintiff's expert, Dr. Dooley, further testified as follows:

Q.      ….Your view is that Dr. Patterson's gap year was caused not only by a failing USMLE CS2 score, but also his low grades?

A.      Yes.

Q.      Now, I know that this letter says USMLE CS2.   And does that to you mean clinic [*sic*] skills?

A.      That would be what I would interpret CS2.   **And it was the clinical knowledge test that was the issue.**

Q.      And so he doesn't have a failing score for clinical skills; correct?

A.      No.

Q.      And does it appear to you that during the time he would have been participating in the 2013 match, he had only a failing score on the clinical knowledge; correct?

A.      Correct.

Q.      And so when you are talking about a failing score, you are referring to the clinical knowledge component?

A.      Right.   Specifically for any – I'd be talking about any of them, failing any of them, as a negative thing.   In his case, it is the clinical knowledge score.[7]

Q.      And so the fact that he didn't have a CS score is not what you are referring to?

A.      No.

Ex. 12, Dooley Dep. at 28:12-29:14.   Testimony by Plaintiff's other listed expert, Dr.

Herman Jones, is equally damaging to his claims:

Q.      Okay. I will call your attention to – I guess it would be the last paragraph on the first page. It states, "Dr. Jones will testify that Randy Blake Patterson likely would have received a match at a mid-level program had he not had a gap year and been delayed, though probably not in his first choice – surgery." Is that an opinion you plan to give at the trial of this matter?

A.      No.

Q.      Is that an opinion you avow?

A.      No….

---

[7]  Dr. Dooley's testimony regarding Plaintiff's Step 2 **CK** failing score refutes any argument by Plaintiff that, if he had been permitted to re-take the Step 2 **CS** exam sooner, it would have made a difference in his outcome for the 2013 residency Match.   Plaintiff did not achieve a passing Step 2 **CK** score until October 10, 2013 – well after the conclusion of the 2013 Match.

> Q.   Do you intend to offer any opinions about whether and to what extent Randy Patterson was damaged as a result of the allegations that form the basis of this lawsuit?
>
> A.   In terms of that he was not given – If I may, that he was not given access to a Step 2 CS in time for –
>
> Q.   Correct.
>
> A.   Okay.  So I believe that was a negative data point, ***but I am unable to directly link that to the fact he did not get a position.*** I think that there are several other factors at play….
>
> Q.   And so you are not going to give an opinion to the effect that Dr. Patterson's inability to retake the Step 2 clinical skills exam any sooner than he did was a cause of him having a gap year or a failure to match?
>
> A.   I – to be clear, I will not offer that opinion.  I will point it out as a negative data point, but it is not my opinion that that is the single thing that caused this to occur.

Ex. 16, Jones Dep. at 36:5-39:1 (emphasis added).

Thus, Plaintiff's own experts cannot make the necessary causal link between the purported breach of contract by NBME and Plaintiff's failure to match with a residency program in 2013, which is the predicate for his claimed damages.   This is an additional basis for awarding NBME summary judgment.

## IV.   BECAUSE PLAINTIFF'S DAMAGES ARE SPECULATIVE, HE CANNOT PROVE AN ESSENTIAL ELEMENT OF HIS CAUSE OF ACTION.

Under Oklahoma law, "[i]n order for damages to be recoverable for breach of contract they must be clearly ascertainable, in both their nature and origin, and it must be made to appear they are the natural and proximate consequence of the breach and not speculative and contingent."  *Southwest Stainless, L.P. v. Sappington*, 582 F.3d 1176, 1184 (10th Cir. 2009)(*citing Florafax Int'l, Inc. v. GTE Mkt. Res., Inc.*, 1997 OK 7, 933 P.2d 282, 296 (Okla.1997)); *see also* 23 O.S. 1991 § 21 *(* "For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided

in this chapter, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom. No damages can be recovered for a breach of contract, which are not clearly ascertainable in both their nature and origin).   Moreover, the claimed damages must be susceptible of ascertainment in some manner other than by mere speculation, conjecture or surmise, and by reference to some definite standard.   *See* 23 O.S. 97; *DTS Tank Service, Inc. v. Vanderveen*, 1984 OK 49, 683 P.2d 1345 (Okla. 1984); *Great Western Motor Lines, Inc. v. Cozard*, 1966 OK 134, 417 P.2d 575, 578 (Okla. 1966).

Here, Plaintiff's damages are speculative both as to whether they would in fact occur and the amount of any resulting damages if they did.   Plaintiff's claim for damages depends upon the occurrence of a series of events, each of which is itself highly speculative.   Plaintiff's claim for damages requires one to conclude:   (1) he would have passed the Step 2 CS exam on January 7, 2013, but for the power outage; (2) he would have matched into a surgical residency in 2013 if he had received a passing result on his January 7 Step 2 CS exam during the normal score-reporting window for that exam (even though the results would have been reported to residency programs ***after*** they were required to submit their Rank Order Lists, and notwithstanding the fact that he had mediocre medical school grades, had failed Step 2 CK, and did not pass that exam until well after the 2013 Match was concluded); (3) he would successfully have completed that residency; (4) he would have passed his boards and become a licensed general surgeon; and (5) he would have earned the average salary of a general surgeon.   There is no evidence whatsoever to establish that each of these events would have occurred, much less that they ***all*** would have

21

occurred.    Instead, a fact finder would be required to engage in rank speculation as to each event.    The *occurrence* of any claimed damages is thus entirely speculative.

The *amount* of his claimed damages is also speculative.    Plaintiff's claimed injuries consist of "lost life years, the opportunity to complete [his] education, the balance of his student loans, plus interest, attorney's fees, [and] lost earning," resulting in claimed damages "in excess of a million dollars." Ex. 13, Randy Patterson Dep. at 30:10-16; 31:22.[8]   The amount of these claimed damages, however, can be derived only from conjecture and speculation.

According to Plaintiff, but for the actions of NBME, he would be in his fourth year of residency; thus, he claims, he has lost three years of a resident's compensation.    Ex. 13, Patterson Dep. at 31:23-32:2.    However, no qualified witness has testified Plaintiff would have matched into any residency in 2013 but for the alleged breach of contract by the NBME, much less identified the subject area of that residency or the compensation paid to residents practicing in that area.

Dr. Patterson's claim for damages for lost earnings as a practicing physician are likewise speculative.    He testified that the average physician in the United States earns

---

8   Plaintiff's damage claims have varied over time.    In his initial disclosures, he claimed (1) that he would have an economic loss expert (which he never identified), and (2) that he has lost five years of income as a residency-trained specialist, the cost of medical school tuition, interest on his loans and the cost of re-training, which he believed would exceed $2 million. Ex. 18, Plaintiff's Initial Disclosures. In written discovery, he asserted damages of $2.5 million, consisting of "six years of average salary of general surgeons according to Medscape, plus interest from student loans which continued for six more years."   Ex. 15, Plaintiff's Answers to Defendant's First Interrogatories (Int. No. 10).    Regardless of the claimed amount, however, the claimed damages suffer from the same fatal flaws – they are uncertain and speculative, and they are supported (if at all) only by hearsay.

$198,000 to $220,000 a year, but he acknowledged that actual earnings depend (among other things) on a physician's specialty, Ex. 13, Patterson Dep. at 33:2-16; and he admitted that he obtained those figures not from any sources that relate specifically to him, but from third-party "resources" such as Medscape, the Merritt Hawkins Index, Market Average and Becker's Hospital Review, *id.* at 33:17-23.

Clearly, this information is not based upon Dr. Patterson's personal knowledge and is inadmissible both at trial and for purposes of this motion.   There is no expert who has testified as to the amount of income Dr. Patterson has lost, either as a resident or a residency-trained specialist, by virtue of his failure to match into a residency in 2013, and certainly not one who will tie it to the conduct or actions of the NBME.[9]

Likewise, there is absolutely no evidence that Dr. Patterson would have matched into a surgical residency – *the only specialty to which he applied* in 2013 – and, in fact, all evidence is to the contrary.[10]   Thus, regardless of whether Dr. Patterson *might* have matched into some other less competitive specialty at a low-level residency program in 2013 is irrelevant, because Dr. Patterson never attempted to do so until *after* the gap year which he claims ruined his medical career.   Put simply, Dr. Patterson's alleged damages are completely uncertain and speculative, both as to whether they could be attributed to any

---

9   As set forth above, Dr. Patterson indicated his intent to offer expert testimony to establish his claimed financial damages, but he never did so.

10   The experts in this case all agreed that Dr. Patterson's chances of matching into a surgical residency in 2013 were slim to non-existent, even if he had had a passing Step 2 CS result in advance of the 2013 Match week.   Ex. 12, Dooley Dep. at 11:13-22; 13:13-14:14; 24:16-26:24; Ex. 16, Jones Dep. at 18:17-19:20; 20:3-19; 26:14-19; 35:3-36:16; Ex. 17, Wittgen Report, Opinion No. 1

actions of NBME and as to their amount.

## CONCLUSION

Because there are no genuine issues of material fact relating to Dr. Patterson's breach of contract claim, summary judgment should be entered in favor of NBME.   There are at least three grounds for entering summary judgment, each of which provides an independent basis for awarding NBME summary judgment.

First, the contract between the parties sets forth Plaintiff's exclusive remedy in the event of any error in the administration of the Step 2 CS exam.   The exclusive remedy was a free re-test, which Dr. Patterson was offered and accepted.

Second, Dr. Patterson cannot establish a causal nexus between his claimed injuries and the alleged breach.   The timeline establishes that, had everything gone perfectly on January 7 when he first took the Step 2 CS exam, he could not have expected to receive his results prior to the submission of Rank Order Lists by residency programs during the 2013 Match.   Plaintiff's lack of success in the 2013 Match thus cannot be attributed to the fact that he was not able to re-test sooner.   Instead, as Plaintiff's own experts have testified, his failure to obtain a residency in the 2013 Match was the result of a combination of factors, including his decision to list only surgical residency programs on his Rank Order List, as to which he was not a competitive applicant; his poor medical school grades; his marginally passing Step 1 score; and the failing Step 2 **CK** score reflected in his record when he was participating in the 2013 Match.

Third, Dr. Patterson cannot establish the existence or the amount of his claimed damages with anything other than speculation.

Respectfully submitted,

_/s/ Amy L. Alden_

Jack S. Dawson, OBA #2235
Amy L. Alden, OBA #16978
Miller Dollarhide, P.C.
309 N.W. 9th Street
Oklahoma City, OK 73102
(405) 236-8541
(405) 235-8130 (Facsimile)
jdawson@millerdollarhide.com
aalden@millerdollarhide.com

**_Attorneys for Defendant NBME_**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 15th day of September, 2016, I electronically transmitted the attached document to the Clerk of the Court using the ECF System for filing.   Based upon the records currently on file, the Clerk of the Court will transmit a Notice of Electronic Filing to the following ECF registrants:

> Steven E. Clark, clark@clarkmitchell.com
> Heather Mitchell, heather@clarkmitchell.com
> Katie L. Templeton, katie@clarkmitchell.com


                                    ___*/s/ Amy L. Alden*_____