THE DISTRICT COURT OF OKLAHOMA COUNTY
STATE OF OKLAHOMA

RANDY BLAKE PATTERSON,        )
                              )
            Plaintiff,        )
vs.                           )
                              ) Case No. CJ-2015-5283
NATIONAL BOARD OF MEDICAL     )
EXAMINERS,                    )
                              )
            Defendant.        )

DEPOSITION OF WILLIAM DOOLEY, M.D.
TAKEN ON BEHALF OF THE DEFENDANT
IN OKLAHOMA CITY, OKLAHOMA
ON AUGUST 31, 2016



METROPOLITAN BUILDING
400 North Walker, Suite 160
Oklahoma City, OK 73102
405-235-4106

MID-CONTINENT TOWER
401 South Boston, Suite 310
Tulsa, OK 74103
918-599-0507

depo@drreporting.com

REPORTING & VIDEO, INC.

REPORTED BY JILL TUCKER SHAW, CSR #1459

EXHIBIT 12

## Page 1

THE DISTRICT COURT OF OKLAHOMA COUNTY
STATE OF OKLAHOMA

RANDY BLAKE PATTERSON,   )
                         )
        Plaintiff,       )
vs.                      )
                         ) Case No. CJ-2015-5283
NATIONAL BOARD OF MEDICAL )
EXAMINERS,               )
                         )
        Defendant.       )

DEPOSITION OF WILLIAM DOOLEY, M.D.
TAKEN ON BEHALF OF THE DEFENDANT
IN OKLAHOMA CITY, OKLAHOMA
ON AUGUST 31, 2016

REPORTED BY JILL TUCKER SHAW, CSR #1459

## Page 2

1  APPEARANCES
2
3  FOR THE PLAINTIFF:
4     STEVEN E. CLARK
      KATIE TEMPLETON
      Attorneys at Law
5     Clark & Mitchell, P.C.
      101 Park Avenue, Suite 210
6     Oklahoma City, Oklahoma 73102
      (405) 235-8488
7     Katie@clarkmitchell.com
8  FOR THE DEFENDANT:
9     AMY ALDEN
      Attorney at Law
10    Miller Dollarhide
      210 Park Avenue, Suite 2550
11    Oklahoma City, Oklahoma 73102
      (405) 235-8130
12    Aalden@millerdollarhide.com
13 FOR THE WITNESS:
14    JENNIFER NEEDHAM
      Attorney at Law
15    OU Health Sciences Center
      1105 N. Stonewall, Suite 221
16    Oklahoma City, Oklahoma 73117
      Jennifer-needham@ouhsc.edu

## Page 3

EXAMINATION INDEX
WILLIAM DOOLEY, M.D.
    DIRECT BY MS. ALDEN . . . . . . . . . . . . 5
    CROSS BY MR. CLARK . . . . . . . . . . . . 35

EXHIBIT INDEX

                                              Page
Defendant's Exhibits
1   Letter from Clark & Mitchell to Jack    16
    Dawson and Amy Alden dated June 24, 2016

2   USMLE Certified Transcript of Scores    23

3   Handwritten ranking forms for Blake     31
    Patterson M.D.

## Page 4

STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED BY and between the parties hereto, through their respective attorneys, that the deposition of WILLIAM DOOLEY, M.D., may be taken on behalf of the Defendant on August 31, 2016, in Oklahoma City, Oklahoma, by Jill Tucker Shaw, Certified Shorthand Reporter for the State of Oklahoma, pursuant to Notice and agreement.

IT IS FURTHER STIPULATED AND AGREED BY and between the parties hereto, through their respective attorneys, that all objections, except as to the form of the question and responsiveness of the answer, are Reserved until the time of trial, at which time they may be made at the time of the taking of this deposition.

William Dooley, MD                                                            August 31, 2016

Page 5

1     WILLIAM DOOLEY, M.D.,
2  being first duly sworn, deposes and says in reply to
3  the questions propounded as follows:
4            DIRECT EXAMINATION
5  BY MS. ALDEN:
6     Q.  State your name, please.
7     A.  William Chestnut Dooley.
8     Q.  And, Dr. Dooley, what is your home address?
9     A.
10
11    Q.  What's your business address?
12    A.  920 Stanton L. Young, Suite 2140, Oklahoma
13 City, Oklahoma, 73104.
14    Q.  Dr. Dooley, have you ever given a deposition
15 before?
16    A.  Yes.
17    Q.  So you are familiar with the process.  I'll
18 ask you questions and you'll answer them.
19    A.  (Witness nods head.)
20    Q.  We'll try not to speak over.
21    A.  Okay.
22    Q.  And you nodded your head in response to my
23 last question.  If I ask you to verbalize your
24 answer, it's because it makes it easier for the court
25 reporter and for all of us reading the transcript

Page 6

1  later on to know exactly what it was that you said.
2  Okay?
3     A.  Yes.
4     Q.  If I ask you a question that you don't
5  understand or for whatever reason doesn't make sense
6  to you, would you ask me to rephrase it?
7     A.  Okay.
8     Q.  And otherwise, we'll take a break anytime
9  you would like to take one.
10       You are represented by counsel here today;
11 correct?
12    A.  Yes.
13    Q.  Ms. Needham?
14    MS. NEEDHAM:  Yes.
15    Q.  (BY MS. ALDEN)  And tell me what you did to
16 prepare for the deposition today, if anything?
17    A.  Nothing besides the telephone calls from
18 each side that were done a month or two ago.
19    MS. NEEDHAM:  And Amy, my apologies.  I
20 would, since you started out with that question, like
21 to make an announcement for the record as far as my
22 representation of Dr. Dooley.
23       I am in-house counsel for the University.
24 So I represent him in his employment capacity as long
25 as he's in the scope of his employment, which here

Page 7

1  would be administrative and teaching capacities.  The
2  University doesn't have expertise in this case.  So I
3  don't think it's proper to ask that.  But to the
4  extent he is asked an opinion question, that will be
5  his personal opinion, not the opinion of the
6  University.  And I do not represent him in his
7  experience capacity.
8        However, the plaintiff was a student at the
9  University.  So Dr. Dooley probably does have
10 knowledge of facts leading up to this case.  And I
11 just wanted to clarify that.  So I would object to
12 anything that is not factual.
13    MS. ALDEN:  Okay.
14    Q.  (BY MS. ALDEN)  Anything that you want to
15 add to that in your personal capacity, Dr. Dooley?
16    A.  I was told that I was named as an expert.  I
17 never agreed to be an expert for anybody.  So I'm
18 here as a factual witness, not an expert.
19    Q.  Okay.  I did not name you as an expert
20 witness.  It's my understanding you are going to give
21 opinion testimony in this case.  However, I
22 understand that your expert opinions are your
23 intellectual property.  And so to the extent you are
24 willing to share them, great.  And if you're not
25 willing to share them, I certainly understand that.

Page 8

1  But that will be up to you and Ms. Needham.
2     MR. CLARK:  Let me interpose my own
3  statement and objection.
4        I advised counsel for NBME, Mr. Dawson, that
5  Dr. Dooley and Dr. Jones were not retained experts.
6  We had a lengthy discussion of whether they should be
7  designated experts under the federal rules to
8  technically comply.  I don't think there's any real
9  dispute as to their role.  If they have been "deemed"
10 experts, it was simply to qualify or to comply with
11 the very technical aspects of the federal rules.
12       So it's my understanding Mr. Dawson and I
13 had an agreement as to their role.
14    MS. ALDEN:  And I'm not suggesting you
15 didn't have an agreement.  I'm just saying to the
16 extent that Dr. Dooley has an expert opinion elicited
17 that he doesn't wish to share, I mean, I feel like I
18 have no ability to compel him to share intellectual
19 property that belongs to him.  And if he isn't asked
20 to elicit such an opinion, then so be it.  I'm just
21 saying I understand.
22    Q.  (BY MS. ALDEN)  How are you currently
23 employed, Dr. Dooley?
24    A.  By the University of Oklahoma.
25    Q.  In what capacity?

2 (Pages 5 to 8)

## Page 9

1  A. The G. Rainey Williams Professor of Surgical
2  Breast Oncology.
3  Q. So you are a member of the faculty of the
4  University of Oklahoma College of Medicine?
5  A. Correct.
6  Q. How long have you been affiliated with the
7  University of Oklahoma College of Medicine?
8  A. Since 2001.
9  Q. And what did you do before that?
10 A. I was on the faculty of the Johns Hopkins
11 University School of Medicine.
12 Q. Have you been on the faculty of any other
13 higher education institutions or colleges of
14 medicine?
15 A. No.
16 Q. In your role as a member of the faculty at
17 either Johns Hopkins or the University of Oklahoma
18 Colleges of Medicine, has it been part of your
19 responsibility to advise students who are
20 participating in the National Resident Matching
21 Program?
22 A. It's a routine part of my duties, yes.
23 Q. And can you tell me a little bit about what
24 that experience looks like?
25 A. Usually, in the third year, as they're

## Page 10

1  approaching the fourth year, they begin to take the
2  exams necessary and do the application process for
3  residency application. And they will begin to look
4  for letters of recommendation which then go into the
5  matching program.
6      And once they complete their record for the
7  matching program, interested programs that they're
8  applying to get to decide who they want to interview,
9  who they don't. And then after the interviews, the
10 residency programs rank in order of their preference
11 who they would like to have and the applying
12 interns/residents do the same.
13     And then a computer program matches them up
14 to make best matches, and that's the match system.
15 Usually, they're told on the Ides of March of their
16 fourth year.
17 Q. Okay. They're told whether or not they have
18 achieved a match with a residency program?
19 A. And where it is. Up until that point, they
20 have no idea of where they may be working as of July
21 1 of that year after they graduate.
22 Q. In that process that you just described,
23 what is your role in assisting students? Or at least
24 as I understood you to say, you had a role in
25 advising students through that process?

## Page 11

1  A. One, to write letters of recommendation for
2  them, if requested. Two, when they have questions
3  about residency training programs and what their
4  capabilities might be for what would be a best match
5  for them, to give some advice as to where they stand
6  relative to their peers and what they might match --
7  best match for, and what's within the scope of their
8  likely matching and what's probably beyond the scope
9  of their typically matching.
10 Q. Did you have any discussions with Randy
11 Blake Patterson, the plaintiff in this case, about
12 what was within the scope or beyond the scope of
13 probability for him in terms of a residency match at
14 any time?
15 A. Yes.
16 Q. Can you tell me about those conversations?
17 A. Yes. He was in a lower percentile rank in
18 his class, which made him not a good candidate for
19 many surgical training programs. It is a level at
20 which he probably could have gotten rotating
21 internships, but not necessarily directly out of a
22 surgical internship residency program.
23 Q. Can I stop you right there and ask you to
24 clarify what you mean by that? You are kind of
25 talking in a lingo that is foreign to me.

## Page 12

1  A. Okay. Surgical training programs now mostly
2  accept people, and expect to accept an intern class,
3  who then will, over the span of the next five years,
4  progress to finishing a surgical residency, passing
5  the qualifying and certifying exams in surgery, and
6  becoming board certified surgeons at the end of their
7  residency. So they are making really a long-term
8  commitment to somebody who they think has the
9  capability of doing that.
10     For that reason, they tend to be competitive
11 and tend to pick from the upper tier, the upper 50 or
12 60 percent of the class. When you fall below that
13 level, it's harder to match into a surgical program
14 that's willing to make a commitment for a long period
15 of time.
16     There are options for people who are
17 interested in surgery who may fall below the level,
18 which would normally match for a long surgical
19 residency --
20 Q. Is that what's known as a categorical
21 position?
22 A. Yes, those could be categorical positions in
23 surgery, where there are institutions not making a
24 commitment more than one to two years. Or rotating
25 internships, which where you are not specified to a

Page 13

1  particular residency subspecialty, but then you can
2  apply later to fill slots that become available.
3       People may start surgical residencies, and
4  for illness/family, decide they are not interested in
5  this and will switch specialties, and then gaps will
6  appear in regular surgical training programs. And
7  usually the pool they pick from is this pool that has
8  been either categorical or rotating. And they pick
9  somebody from that and make a longer commitment. Or
10 they may make a commitment for a single year and, if
11 they perform well, then extend that for a longer
12 period.
13      Q.  And before I asked you to stop and clarify,
14 you were telling me that because Dr. Patterson was in
15 the lower ranks of his class, it made him not a good
16 candidate for many surgical training programs.
17      A.  Correct.
18      Q.  Continue with what you were saying about
19 that, if you would.
20      A.  Well, that means the major university
21 programs, the bigger community hospital programs,
22 would be looking for somebody with both higher
23 medical school grades and higher board scores and
24 higher scores on shelf exams for the various
25 rotations, clinical rotations, than he had. So I had

Page 14

1  recommended to him that he consider categoricals --
2  rotating internships, research -- as an alternative
3  so he could take an exam again and get a higher score
4  on it, something to fill the time, because not
5  filling the time would make it harder to get into any
6  kind of program, and look for programs that had
7  recently been placed on probation or were in a
8  probationary period about to come off, because
9  usually those were not attractive to people who are
10 in the upper half of a medical school class.
11      So he might get a chance for a program who
12 would risk a slot on him if they were trying to get
13 out of a marginal situation relative to the residency
14 program.
15      Q.  Do you know how many times Dr. Patterson
16 participated in the residency match?
17      A.  I know he -- or I believe that he
18 participated at least twice.
19      Q.  Do you know whether or not these discussions
20 that you had with him took place before the first
21 time he participated in the match, or would it have
22 been subsequent to that? Do you know?
23      A.  I believe I discussed with him before each
24 of the two times that I was aware that he
25 participated.

Page 15

1       Q.  Do you know whether or not he followed that
2  advice?
3       A.  No.
4       Q.  Have you ever been the program director of a
5  residency program?
6       A.  No.
7       Q.  Are you involved in evaluating residency
8  candidates for any residency programs?
9       A.  Yes.
10      Q.  Tell me --
11      A.  Both at Hopkins and here.
12      Q.  Tell me about your experiences at Hopkins
13 and here at OU College of Medicine in evaluating
14 prospective residency candidates.
15      A.  I interview them when they come for the
16 interviews. At neither institution did I participate
17 in deciding who to interview, but I interviewed them
18 and then the faculty meet -- all the faculty who have
19 interviewed meet and discuss the -- how to rank them
20 and then participate in a ranking in the order of
21 which we would like to have them as our residents.
22      So I've done that at both institutions a
23 total of 30 plus years.
24      Q.  And has that been for surgical residencies?
25      A.  Surgical residency -- general surgery

Page 16

1  residency.
2       Q.  Any other specialty?
3       A.  We had a surgical oncology training program
4  at Johns Hopkins when I was there, a fellowship
5  program. So I participated in that program. And I
6  have not participated in -- for other residency
7  programs.
8       Q.  So everything has been related to surgical
9  residency?
10      A.  Yes.
11      (Defendant's Exhibit No. 1 was marked for
12 identification purposes.)
13      Q.  (BY MS. ALDEN) Okay. I'm going to hand you
14 what's been marked as Exhibit 1 to your deposition.
15 And this is a letter that we received from
16 Dr. Patterson's counsel outlining what they expect
17 your testimony to be at the trial of this matter, and
18 so I want to ask you some questions about it.
19      If you'll look at the third full paragraph
20 on that first page, it states that, "Dr. Dooley has
21 stated he will testify that Randy Blake Patterson
22 would have interviewed better than his grades perhaps
23 indicated."
24      Is it your intent to give that testimony at
25 the trial of this matter?

William Dooley, MD                                                August 31, 2016

Page 21

1   I thought it was unlikely he would be interviewed,
2   given his class rank.
3       Q. Was there any other reason that you thought
4   he might not be interviewed?
5       A. Well, the residents who had reviewed his
6   performance rotating on the service were not of a
7   strong enough opinion that he would be a good fit
8   with the other residents. And since they are going
9   to be paired together for many years, we tend to
10  watch out to make sure they believe the people we're
11  choosing are going to be a good fit to work within
12  the group and not be the odd person out or not mesh
13  well with that group of residents.
14      Q. You mentioned at the beginning of your
15  deposition that you had, on previous occasions,
16  visited both with plaintiff's counsel and with me.
17      A. Sure.
18      Q. Do you recall, in our conversation at least,
19  saying that Dr. Patterson was viewed as a bit of an
20  odd duck?
21      A. Yes.
22      Q. And you felt that you might have a rebellion
23  on your hands if he was offered a residency position
24  here at the University of Oklahoma?
25      A. Correct.

Page 22

1       Q. We talked about that, of course, he has to
2   be offered an interview before he can be matched up
3   with a program that would push him sufficiently.
4           Are there other factors besides just grades
5   that go into a program's decision to offer an
6   interview to a prospective resident?
7       A. To get to the baseline of the interview, you
8   need grades and national board scores, percentile
9   scores. And the better ones like to see top scores
10  taking the exam only once. You occasionally -- if
11  somebody looks pretty good on paper, they can have a
12  bad day and take the exam again and show much
13  improvement and the people feel better about it.
14          That's always a concern though, because the
15  rest of the residency is a series of standardized
16  exams. So you want to get somebody who is going to
17  be able to pass those exams actually and finish the
18  residency.
19      Q. What is your familiarity with
20  Dr. Patterson's history of board scores? And by
21  board scores, we're talking about the USMLE -- the
22  various components of the USMLE; correct?
23      A. Yes.
24      Q. Tell me, what is your familiarity with
25  Dr. Patterson's history of scores with the USMLE?

Page 23

1       A. I don't have them immediately available to
2   me, but I know that he struggled to pass the scores,
3   particularly the part two.
4           (Defendant's Exhibit No. 2 was marked for
5   identification purposes.)
6       Q. (BY MS. ALDEN) I want to hand you what has
7   been marked as Exhibit 2 to your deposition, and ask
8   you if that's a type of document that you've seen
9   before.
10      A. Yes.
11      Q. Can you tell us what it is?
12      A. It's the transcript of scores from the
13  USMLE.
14      Q. And does it appear to be the transcript for
15  Dr. Patterson?
16      A. Yes.
17      Q. Take a look at the transcript and then I'll
18  ask you some questions about it.
19      A. Yeah, I've looked at it.
20      Q. It says that Dr. Patterson took the Step 1
21  component of the USMLE in June of 2011. He passed
22  with a score of 190, with a minute passing score
23  being 188.
24          In your experience, how does that -- what
25  type of score is that?

Page 24

1       A. That's going to be in the lowest 20th
2   percentile of students going into a surgical training
3   program.
4       Q. Looking at the USMLE Step 2, does it show
5   when Dr. Patterson sat for the clinical skills
6   portion of the USMLE?
7       A. Yes. Clinical skills was on August 6, 2013.
8       Q. And it shows a passing score; correct?
9       A. Right.
10      Q. Does it show that he ever took Step 2 CS at
11  any other time?
12      A. No.
13      Q. And so therefore, it does not show that he
14  had a failing score on the Step 2 CS, does it?
15      A. No.
16      Q. But if you will look at the step 2 CK, it
17  says that he sat for that portion of the exam on
18  December 22, 2012, and achieved a failing score;
19  correct?
20      A. Correct.
21      Q. Do you know whether or not that failing
22  score was reported prior to Dr. Patterson's first
23  time participating in the match?
24      A. I don't remember the dates specifically.
25      Q. Okay. Would that -- and let me -- in

William Dooley, MD                                              August 31, 2016

Page 25

1  fairness to Dr. Patterson, he then took it again and
2  passed it; correct?
3      A.  Marginally, yes.
4      Q.  Okay.  That would be --
5      A.  Not a high score, but partial pass.
6      Q.  Okay.  Would the initial failing score be a
7  negative mark for residency programs considering
8  Dr. Patterson?
9      A.  It would be.  And it could really only be
10 overcome by a pretty remarkable high pass score the
11 second go-round, that he just had a bad day or
12 something.  But a marginal pass doesn't help you very
13 much.  You need to score really dramatically higher.
14     Q.  Okay.  If Dr. Patterson had had something
15 else as part of his package in addition to the
16 failing score and the marginal score, would that have
17 made it more probable that he would have been
18 interesting to a surgical residency program, in your
19 experience?
20     A.  It's difficult to overcome these cluster --
21 his class rank plus this.  But performance and
22 research and publications and that sort of thing
23 might have convinced somebody to risk.
24         But again, it would be not one of the upper
25 tier programs.  It would be a program who needed to

Page 26

1  take some risks to fill a slot because they were
2  short of people.
3      Q.  Do you have any awareness as to whether or
4  not Dr. Patterson did anything to sort of make
5  himself competitive for those lower tier programs
6  that you mentioned?
7      A.  I believe he was working on school public
8  health for a period of time when he didn't match the
9  first time before he tried the second go-round, as I
10 remember.
11     Q.  Does that rise to the level of an experience
12 that would make it likely that he would --
13     A.  He would need a --
14     Q.  -- get a surgical residency?
15     A.  He would need a stellar performance and
16 overwhelmingly positive reviews of that performance
17 to be able to overcome.
18     Q.  Would it make a difference if he enrolled
19 for a Master in Public Health, but did not receive a
20 Master degree and instead got a Certificate in Public
21 Health?
22     A.  That probably would not rise to the level of
23 counteracting the negative from his class rank plus
24 the board scores.
25     Q.  And the responsibility for getting that

Page 27

1  stellar experience in the gap year, that would fall
2  on Dr. Patterson, wouldn't it?
3      A.  Yes.
4      Q.  I want to take another look at Exhibit 1, if
5  you would.  Again, it's the third full paragraph and
6  it says, "The gap year as a result of failing the
7  USMLE CS2 exam likely caused Dr. Patterson to be
8  excluded from some interviews in his second
9  application for a match."
10        Is this an opinion or opinions which you
11 intend to give at the trial of this matter?
12     A.  His class rank plus USMLE failure in
13 combination probably led to exclusion from some
14 interviews.
15     Q.  You don't know with any amount of certainty,
16 do you?
17     A.  No.  But from many years of sitting on
18 committees reviewing these applications, it would
19 have likely fallen well below the level of even
20 inviting somebody for an interview.
21     Q.  And in reference to the gap year, I just
22 want to make sure we are talking about the same
23 thing.  I'm going to represent to you that
24 Dr. Patterson participated in the match for the first
25 time in 2013.

Page 28

1      A.  Okay.
2      Q.  When you are talking about a gap year, are
3  you talking about the year from the time that he did
4  not match in 2013 around to the second time he
5  participated in the match in 2014?
6      A.  It would be a gap year between the fourth
7  year of medical school and starting residency.  You
8  should graduate medical school and start a residency
9  within a few months.  So a gap year is anytime beyond
10 that year.
11     Q.  Okay.  I'm glad I asked.
12        Do you have -- and you may have already said
13 this, but I want to be clear.  Your view is that
14 Dr. Patterson's gap year was caused not only by a
15 failing USMLE CS2 score, but also his low grades?
16     A.  Correct.
17     Q.  Now, I know that this letter says USMLE CS2.
18 And does that to you mean clinic skills?
19     A.  That would be what I would interpret CS2.
20 And it was the clinical knowledge test that was the
21 issue.
22     Q.  And so he doesn't have a failing score for
23 clinical skills; correct?
24     A.  No.
25     Q.  And does it appear to you that during the

Page 29

1  time he would have been participating in the 2013
2  match, he had only a failing score on the clinical
3  knowledge; correct?
4      A. Correct.
5      Q. And so when you are talking about a failing
6  score, you are referring to the clinical knowledge
7  component?
8      A. Right. Specifically for any -- I'd be
9  talking about any of them, failing any of them, as a
10 negative thing. In his case, it is the clinical
11 knowledge score.
12     Q. And so the fact that he didn't have a CS
13 score is not what you are referring to?
14     A. No.
15     Q. Okay. Do you have any knowledge about what
16 programs Dr. Patterson applied to for his second
17 application for a match?
18     A. I don't remember which time he applied for.
19 I know that I heard applications to Stanford and some
20 really top notch programs, which would have been
21 difficult for somebody in the top 15 percent of the
22 class here, not somebody in the bottom.
23        So I thought the list of programs was
24 weighted very heavily to programs that were well
25 beyond his capabilities of getting an interview or

Page 30

1  even remotely being a resident.
2      Q. In your experience, is it important for the
3  fourth year medical students who are attempting to
4  get into residency to have a realistic appreciation
5  of what they might be capable of achieving in terms
6  of a residency?
7      A. Absolutely. This is just like colleges.
8  You want to have some that are sure bets, and you can
9  pick a few to try to sell yourself to that are beyond
10 sure bets, but you need some backup programs. So you
11 need a spectrum of programs to match at and to try to
12 match. So you definitely need some. And his target
13 had to be fairly low for him to be reliably matched.
14     Q. And did you have -- and again, I may be
15 asking this -- it may be the same question and asking
16 it a little different way.
17        Did you have an impression, back during the
18 time when you were talking to Dr. Patterson, about
19 whether or not his expectations were realistic for
20 his medical school performance and board scores?
21     A. We had some pretty serious discussions about
22 his expectations and his desires not matching his
23 direct likelihood of getting into a program, which is
24 why I encouraged community surgical programs that had
25 been on probation and programs where he wouldn't

Page 31

1  necessarily be asking them to commit to him for a
2  five-year residency, but try me out and I'll work
3  hard and then hopefully then sell myself to either
4  that program or other programs later.
5      Q. And do you know whether or not he followed
6  that advice?
7      A. I don't remember seeing a full list of
8  everything he tried to match for, but my impression
9  was he was trying -- weighing it much heavier toward
10 programs that he had little to no chance.
11     Q. Would that be consistent with your
12 impression that he lacked self awareness?
13     A. Correct.
14     Q. And you are not stating that there is any
15 specific program that you are aware of who declined
16 to interview him because of the fact he had a gap
17 year, are you?
18     A. I have no specific knowledge of that.
19     Q. And the same would be true, you don't have
20 any specific knowledge that any particular program
21 just disqualified him from residency because of his
22 gap year?
23     A. I have no knowledge of that.
24        (Defendant's Exhibit No. 3 was marked for
25 identification purposes.)

Page 32

1      Q. (BY MS. ALDEN) I'm handing you what has
2  been marked as Exhibit 3 to your deposition. And
3  I'll ask you to look through that stapled packet of
4  documents, if you would.
5      A. Okay. Yes.
6      Q. And I will represent to you that these are
7  documents that were produced by the University of
8  Arkansas in response to a subpoena in this case.
9         Do these appear to you to be -- let me ask
10 you this. You talked earlier about in your
11 experience in evaluating prospective residents, you
12 were involved in ranking residents who were
13 interviewed.
14     A. Correct.
15     Q. Do I understand that correctly?
16     A. Yes.
17     Q. And did you guys -- you said you met -- as a
18 committee, you met.
19        Did you make notes when you visited with
20 prospective candidates?
21     A. Yes. We have a standardized ranking form
22 that the faculty do and write comments. Plus, the
23 residents who usually go to dinner the night before
24 with them or take them on tours around the hospital
25 and answer questions also put in comments as well.

Page 45

1  Q. There's a screening process someplace. And
2  the presence of a gap year before anybody actually
3  looks at physical records shows up in that screening
4  process; true?
5      A. It does. It's the cause for the gap that's
6  the hurdle, not the gap. Again, I'm giving you an
7  example of students at Hopkins that got very inspired
8  by doing research -- summer research in their time
9  off medical school regular classwork and got very
10 enthused about it and decided to do gap years in a
11 very powerful research lab and were very productive.
12 That doesn't hurt them at all.
13      So it's the cause of the gap year that's the
14 issue, not the fact that you have a gap year. It's
15 the underlying cause of the gap year.
16  Q. A student from medical school like the
17 University of Oklahoma has a much better chance of
18 getting a match than a student from Grenada or
19 Guadalajara Medical School; true?
20      A. Typically.
21      MR. CLARK: That's all. Thank you, Doctor.
22      MS. ALDEN: I don't have any other further
23 questions.
24      I do need to tell you that you have the
25 ability to read and sign your deposition and look to

Page 46

1  make sure the court reporter took everything down or
2  that you were --
3      THE WITNESS: She's going to review it for
4  me and tell me if I need to change anything.
5      MS. NEEDHAM: I have asked for an e-mail
6  copy.
7      THE REPORTER: So is he going to read and
8  sign?
9      MS. NEEDHAM: He can waive that.
10     THE WITNESS: Yeah, I'm fine.
11     (Signature waived; witness excused;
12 deposition concluded at 10:15 a.m.)

Page 47

1            CERTIFICATE
2  STATE OF OKLAHOMA  )
                      ) SS:
3  COUNTY OF OKLAHOMA )
4      I, JILL TUCKER SHAW, C.S.R. for the State of
5  Oklahoma, certify that WILLIAM DOOLEY, M.D., was by
6  me sworn to testify the truth; that the deposition
7  was taken by me in stenotype and thereafter
8  transcribed and is a true and correct transcript of
9  the testimony of the witness; that the deposition was
10 taken on August 31, 2016, in Oklahoma City, Oklahoma;
11 that I am not an attorney for or a relative of either
12 party, or otherwise interested in this action.
13     Witness my hand and seal of office on this,
14 the 6th day of September, 2016.

16     _____
       JILL TUCKER SHAW, C.S.R.
       Oklahoma Certified Shorthand Reporter
17     Certificate No. 01459
       Expiration Date: December 31, 2016