```
 1            IN THE UNITED STATES DISTRICT COURT
 2            FOR THE WESTERN DISTRICT OF OKLAHOMA
 3
 4   RANDY BLAKE PATTERSON,              )
                                         )
 5             Plaintiff,                )
                                         ) No.
 6   vs.                                 ) CIV-15-1204-HE
                                         )
 7   NATIONAL BOARD OF MEDICAL           )
     EXAMINERS,                          )
 8                                       )
               Defendant.                )
 9
10
11
12      VIDEOTAPE DEPOSITION OF RANDY BLAKE PATTERSON, I
13            TAKEN ON BEHALF OF THE DEFENDANT
14               IN OKLAHOMA CITY, OKLAHOMA
15                   ON JUNE 29, 2016
16
17
18
19        REPORTED BY:   KAREN B. JOHNSON, CSR
20
21
22
23                          METROPOLITAN BUILDING        MID-CONTINENT TOWER
                            400 North Walker, Suite 160  401 South Boston, Suite 310
24   D&R                    Oklahoma City, OK 73102      Tulsa, OK 74103
                            405-235-4106                 918-599-0507
25                              depo@drreporting.com
           REPORTING & VIDEO, INC.
```

EXHIBIT 13

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

RANDY BLAKE PATTERSON,           )
                                 )
        Plaintiff,               )
                                 )No.
vs.                              )CIV-15-1204-HE
                                 )
NATIONAL BOARD OF MEDICAL        )
EXAMINERS,                       )
                                 )
        Defendant.               )

VIDEOTAPE DEPOSITION OF RANDY BLAKE PATTERSON, I
TAKEN ON BEHALF OF THE DEFENDANT
IN OKLAHOMA CITY, OKLAHOMA
ON JUNE 29, 2016

REPORTED BY: KAREN B. JOHNSON, CSR

## Page 2

APPEARANCES

For the Plaintiff:
    Steve Clark
    Katie L. Templeton
    Clark & Mitchell
    101 Park Avenue, Suite 210
    Oklahoma City, Oklahoma 73102
    clark@clarkmitchell.com
    katie@clarkmitchell.com

For the Defendant:
    Jack Dawson
    Miller Dollarhide
    210 Park Avenue, Suite 2550
    Oklahoma City, Oklahoma 73102
    jdawson@millerdollarhide.com

Also Present:
    Jim Langlois, Videographer

* * * * *

## Page 3

CONTENTS
                                              Page
Direct Examination by Mr. Dawson               5
Cross-Examination by Mr. Clark                83
Redirect Examination by Mr. Dawson            91

DEFENDANT'S EXHIBITS
                                              Page
Exhibit Number 1   Dr. Patterson's Resume'    11
Exhibit Number 2   Herman Jones Memo          34
Exhibit Number 3   Memo From Dr. Patterson    40
Exhibit Number 4   E-mail                     43
Exhibit Number 5   Letter From Mr. Sharp      46
Exhibit Number 6   E-mail                     46
Exhibit Number 7   E-mail                     46
Exhibit Number 8   Letter From Dr. Smith      50
Exhibit Number 9   E-mail                     60
Exhibit Number 10  E-mail                     64
Exhibit Number 11  Memo From Dr. Andrews      68
Exhibit Number 12  USMLE Scores               71

## Page 4

STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED by and among the attorneys for the respective parties hereto that the deposition of RANDY BLAKE PATTERSON, I may be taken on behalf of the Defendant on the 29TH of JUNE, 2016, in OKLAHOMA CITY, OKLAHOMA, by Karen Johnson, Certified Shorthand Reporter for the State of Oklahoma, taken pursuant to Federal Rules of Civil Procedure.

* * * * * *

Randy Patterson                                                              June 29, 2016

Page 5

1    THE VIDEOGRAPHER: We are now on the
2    record. This is a videotape deposition taken of
3    Randy Blake Patterson. It is Wednesday, it's June
4    29th, the year is 2016, the time is approximately
5    10:02 a.m., and you may swear in the witness.
6        RANDY BLAKE PATTERSON, I,
7    after having been first duly sworn at 10:02 a.m.
8    deposes and says in reply to the questions
9    propounded as follows, to wit:
10           DIRECT EXAMINATION
11   BY MR. DAWSON:
12       Q   Tell us your name, sir.
13       A   Randy Blake Patterson, I.
14       Q   Randy Blake Patterson?
15       A   The first.
16       Q   The first?
17       A   Yes.
18       Q   Is there a second?
19       A   No.
20       Q   Okay.
21       A   I just wanted to be specific.
22       Q   Okay. And it's Dr. Patterson?
23       A   I'd say so.
24       Q   Okay. Whenever -- what we do in
25   depositions is we kind of insist on the witness

Page 6

1    giving a -- a verbal or audible answer. When you
2    nod at me like that, I know what you're saying and
3    we can -- and we have a video that -- but the court
4    reporter doesn't have anything to nod -- to write if
5    you nod.
6        A   Okay.
7        Q   Okay? So if I -- if I ask you -- if -- if
8    you say, for instance, uh-huh, I may say, is that a
9    yes? I'm not trying to be a smart aleck, I'm just
10   trying to make a record, okay?
11       A   I understand.
12       Q   All right. Have you ever given a
13   deposition before?
14       A   No, sir.
15       Q   All right. You've had the opportunity to
16   visit with your lawyers about what a deposition is;
17   right? I'm not going to go into that conversation,
18   but you've had that opportunity?
19       A   Yes.
20       Q   Okay. Well, there's a couple of reasons I
21   want to take your deposition. First, I want to know
22   what your testimony's going to be at trial, does it
23   seem fair and reasonable to you that if I ask you
24   the same question at trial, that I'm going to get
25   the same answer at trial?

Page 7

1        A   Yes, that seems reasonable.
2        Q   Okay. If you're like me, sometimes you
3    make a mistake, you give the wrong year or just make
4    a mistake in your testimony, if you determine today
5    that you made a mistake in an earlier testimony,
6    will you tell me about that?
7        A   Yes.
8        Q   Okay. Now, after the deposition's over,
9    you'll have the right and the opportunity to read a
10   transcript of your deposition, and if you notice
11   any -- anything you want to correct, I'm fine with
12   you, on an errata sheet, what we call an errata
13   sheet, your lawyers will explain this to you a lot
14   better than I am, okay, but I'm just telling you for
15   my purposes, just write down on the errata sheet, I
16   said so and so, I should have said so and so, okay?
17       A   Yes.
18       Q   And even after that, if you determine your
19   testimony's going to be different at trial, will you
20   tell your lawyers so they can tell me?
21       A   I'll tell my counsel, yes.
22       Q   Yeah.
23       A   A question for you, so the language used
24   in a lot of the documents that have transpired
25   between counsel states as discovery progresses, and

Page 8

1    so how is that handled with deposition? So if
2    something changes between the time my deposition is
3    taken and -- and the trial?
4        Q   Then -- then you some way notify me that
5    your testimony's going to be different at trial.
6        A   Yes, sir.
7        Q   That's -- that's -- that's the whole
8    purpose of taking the dep --
9        A   Okay.
10       Q   That's not the whole purpose, but that's
11   the main purpose, okay?
12       A   Yes, sir.
13       Q   Okay. The other reason to take your
14   deposition is to educate myself, you know things
15   that I don't know, so I want to get an education.
16   The third is your testimony is very important.
17   Sometimes parties give their deposition and then
18   that testimony is used in motion practice, we file
19   motions before the Court and attach the testimony,
20   all right, sir?
21       A   Yes, sir.
22       Q   So the point is, your testimony's very
23   important and it can be used for those purposes.
24   Tell me a little bit about yourself, Dr. Patterson.
25   Give me a elevator speech about Dr. Patterson.

2 (Pages 5 to 8)

## Page 25

1 have done so immediately.
2  Q  Did you do anything to reschedule an exam?
3  A  When the NBME's web administrator unlocked
4 my profile where I could navigate the portal and
5 select a test date, I absolutely did.
6  Q  And when did you start doing that?
7  A  When it became available to me.
8  Q  And what -- tell me how you did that.
9  A  You log into your account and select a
10 test date, and until the NBME clears you to do so,
11 you're not -- not able to do that.
12  Q  So you log in and you select a test date
13 and test site?
14  A  That's correct.
15  Q  And -- and explain how that's done.
16  A  There is a calendar, you -- you select a
17 city in which you wish to test, one of the five, and
18 then the month, and it displays the -- a calendar
19 for that month, and there's a legend of different
20 colors that indicate which test dates have
21 availability and those that are full to capacity,
22 and so you check the available dates and ideally
23 schedule an exam on a desired date that would allow
24 you to complete your testing, meet your graduation
25 requirements, and move forward with your education.

## Page 26

1  Q  And which site did you select?
2  A  I selected the earliest available site, I
3 checked Philadelphia, Chicago, Atlanta, Houston and
4 Los Angeles, and Los Angeles was the earliest test
5 date I could get.
6  Q  How many times did you attempt to or how
7 many times did you log in to select the test date?
8  A  I don't recall.
9  Q  Was it more than one?
10  A  Yes.
11  Q  More than ten?
12  A  I don't recall.
13  Q  Did you check in or log in every other
14 day, every day, once a week?
15  A  No. I booked the earliest available test
16 date I could find.
17  Q  After that, did you go back and try to
18 find -- did you recheck after you'd selected a date?
19  A  No.
20  Q  And so you retest approximately when?
21  A  August 6th.
22  Q  And when was the -- the match date?
23  A  Sometime in March.
24  Q  And are you -- is it your claim that the
25 only reason that you weren't matched is because you

## Page 27

1 didn't have a -- a completed CS score?
2  A  It's my claim that I wasn't given the same
3 consideration for a position in the match as a
4 student who could complete their licensing and
5 credentialing by July 1 and be ready to serve in a
6 house officer capacity. It's also my claim that the
7 complement of professional opportunities that were
8 available to me is very disparate to someone who
9 perhaps had tested on another day and whose exam or
10 administration of their exam proceeded without
11 complication.
12   MR. DAWSON: Would you kindly read back
13 the question that I asked?
14   COURT REPORTER: "And are you -- is it
15 your claim that the only reason that you weren't
16 matched is because you didn't have a completed CS
17 score?"
18   THE WITNESS: No.
19  Q  (By Mr. Dawson) What were some of the
20 other reasons you didn't match?
21  A  I don't know.
22  Q  Do you take any personal responsibility
23 for anything you did that caused you not to match?
24  A  No.
25  Q  What are some of the other reasons you

## Page 28

1 didn't match?
2  A  I don't know any.
3  Q  Sir?
4  A  I don't know any.
5  Q  What do you think that -- did you ever
6 receive an offer of any type of residency?
7  A  So an offer as such is not permissible
8 conduct in the residency match, and so the residency
9 match is unlike industry in that if you interview
10 someone for your firm, Mr. Dawson, you like that
11 candidate, you can offer them the job, the match
12 doesn't work that way. And so it's blinded in a
13 sense both to applicants and the institutions who
14 are interviewing the candidates, and they submit a
15 list of preferences and those preferences are run
16 through a computer algorithm and if there's a -- a
17 match between the candidate and the institution,
18 then they've secured a position at that institution.
19  Q  Did any institution rank you?
20  A  That's also blinded, I don't know the
21 answer to that question.
22  Q  Was there any opportunity for you to enter
23 into a residency program with any institution?
24  A  Students who don't match during the
25 primary match can seek out residency positions off

Page 29

cycle, and so the residency match happens once a year, it's like admissions to graduate school, law school, medical school, whatever. So if you miss the application window, you can't be admitted to law school off cycle in October or November, so on and so forth, you have to wait until the next academic year rolls around. The match works in that manner.

However, some institutions will have unexpected vacancies where someone who did secure a match to their position or to their institution, rather, is, for whatever reason, unable to fulfill their obligations and that creates an unexpected vacancy, and those opportunities are pretty few and far between and are mostly found by internal candidates. So my best opportunity to find an off-cycle vacancy would be if I had heard about something through the grapevine at the University of Oklahoma, since I am plugged into that network, you know, a student at Parkland in Dallas would, you know, have the opportunity to fill a vacancy, a similar vacancy before it's ever even listed or announced, so.

Q  So did you get an opportunity to participate in any residency program?
A  I have not.

Page 30

Q  Did you have any contact with any university in, say, Kansas that suggested to you maybe they could offer you a residency program?
A  No, I can't think of one in Kansas.
Q  Okay.
A  There was a program in North Carolina that interviewed me off cycle that they filled with another candidate. They interviewed several candidates.
Q  And what do you believe are your damages as a result of whatever claim you're making against National Board of Medical Examiners?
A  Lost life years.
Q  Sir?
A  Lost life years, the opportunity to complete my education, the balance of my student loans, plus interest, attorney's fees, lost earning.
Q  And tell me about the lost earnings. What are they? Do you have a figure in mind for lost earnings?
A  My student loan balance stands at 300,000, I've had to borrow additional funds because of the predicament that the NBME's put me in to pursue an education in dentistry, that's additional life years where I would otherwise be practicing medicine that

Page 31

I'm in dental school relearning a second profession. And so my net -- or my aggregate lifetime economic loss is substantial.

Professional careers are very valuable and that's why they're very desirable, you know, competition is very tough to get into a graduate school. So, you know, when I was admitted to medical school, I thought I'd have a job for the rest of my life. I've been living foot to mouth for the last three years with a medical degree. I'm unable to make the payments on my student loans because that balance is substantial. I was one of a handful of Oklahoma academic scholars at Bishop McGuinness High School, and I did well in college and I was accepted early to medical school. I never thought I would be in a position where I'm in a incredible financial peril, I have no access to credit, no one will hire me because I'm simultaneously overqualified for any entry level position in the work force, but I'm underqualified to do what I've spent years of my life training to do. My damages are in excess of a million dollars.

Q  Do you have any estimate of the amount of your lost earnings?
A  If I were in residency right now and not a

Page 32

dental student, I would be in my fourth year, so I've lost three years of resident's salary, but if I were to begin residency training tomorrow, those three lost years don't -- that net loss isn't just the compensation while on residency, that would also alter my entry point into practice as a -- as an attending physician by three years, so I've lost money with regard to lifetime economic loss on the front end and the back end, and so I -- I have fewer years to pay off the balance of my loan. They've accrued additional years of interest that they wouldn't otherwise. I have fewer years to save for retirement and this has altered my economic outlook considerably.

Q  Let me try it this way, how much money were you going to make as a doctor, a medical doctor?
A  It's variable depending on what specialty you match into.
Q  How much money are you going to make as a dentist?
A  That's also variable. Dentistry is -- professional dentistry is like any other profession in that if you're so inclined, you work more, you make more. Some dentists work fewer hours, so

### Page 33

1  that's a function of -- of how -- how much you work.
2     Q   Okay. Do you have any dollar figure you
3  could put on the difference between what you are
4  going to make as a dentist versus what you would
5  have made as a medical doctor?
6     A   Well, it's going to cost me 250 grand in
7  student loans to become a dentist at 7 percent
8  interest, four lost years of earning as a physician.
9  The average physician in the United States makes
10 around $198,000 to $220,000 a year, depending on
11 whether they are a proceduralist or a cognitive
12 specialist, like an internist or a pediatrician. So
13 if you take that average and multiply it times four,
14 add the balance of my additional loans that I've
15 incurred, that's a considerable change in my
16 economic outlook.
17    Q   Where did you get the figures 198,000 to
18 220,000?
19    A   So there are a number of resources that
20 publish data like this, Medscape is one, the Merritt
21 Hawkins Index is another, Market Average, Becker's
22 Hospital Review also keeps data, and so depending on
23 the resource you use, those numbers vary.
24    Q   When you apply for a residency program,
25 would one of the factors that the residency program

### Page 34

1  look at be the grades you made in medical school?
2     A   I'm sure that's a part of their analysis.
3  They're more interested in the clinical grades than
4  they are the grades that were earned in the didactic
5  years of biochemistry, so on, so forth. I'm sure
6  they look at a variety of things.
7     Q   One of them would be the grades that you
8  make in the classes that you take?
9     A   Presumably.
10    Q   Correct? Well, you say "presumably,"
11 have -- have you talked to advisors there at the OU
12 School of Medicine about what residency programs
13 look at?
14    A   I have, but I've never personally sat on a
15 residency committee or been on the other end of
16 evaluating prospective candidates for a residency
17 program, so I can't speak to the nuances of how
18 candidates are evaluated.
19    Q   And the advisors that you spoke to, did
20 they tell you that the grades that you make in class
21 are something that the residency programs are going
22 to look at?
23  . A   It's part of their analysis.
24        (Defendant's Exhibit Number 2 marked for
25         identification and made part of the

### Page 35

1         record)
2     Q   (By Mr. Dawson) Let me show you what I've
3  marked as Defendant's Exhibit Number 2. I'll just
4  tell you we got this from OU Health Science Center
5  and some kind of a memo signed by Dr. Herman Jones,
6  you know Dr. Jones?
7     A   I do.
8     Q   It tells us that you failed OB-GYN shelf
9  and didactics. Tell me what shelf and didactics
10 means.
11    A   So each department maintains an in-house
12 examination that tests the core content of that
13 discipline, so obstetrics has its own exam, its own
14 shelf exam, surgery has its own shelf exam,
15 pediatrics and the like.
16    Q   What is a shelf exam?
17    A   It's just an examination that is
18 administered at the end of the clerkship, testing or
19 during the clerkship, while it's in progress,
20 testing the subject matter of that specialty in
21 medicine.
22    Q   What is -- what is meant by didactics?
23    A   You don't know what that word means?
24    Q   I get to ask the questions, Doctor,
25 respectfully. I'm going to answer that question.

### Page 36

1     A   Okay.
2     Q   The answer is, no, I don't know what it
3  means, I'm asking you to tell me what didactics
4  means.
5     A   So didactic is a lecture, a lecture
6  component, and so the rotations, the clerkships,
7  rather, have different competencies, and among these
8  are your clinical competencies wherein you're
9  evaluated by the instructors and the people who come
10 into contact with you while you're rotating through
11 your -- the different departments, that's a
12 component of your grade, but there's also an
13 academic component to your grade or, you know, a
14 written test, reading, all those things are
15 didactic.
16    Q   Well, I apologize, I don't understand --
17 or the written test, is that part of the word
18 "didactics" or is that the shelf test?
19    A   That's the didactic component.
20    Q   Okay.
21    A   The shelf exam. There's the didactic
22 component and a clinical component.
23    Q   All right.
24    A   And a professionalism component.
25    Q   How -- how important do you think the

Page 93

    1   program, you know, indicated to me expressly this is
    2   why we didn't choose you, or whatever, just because
    3   that's not customary.
    4           MR. DAWSON: That's all.
    5           MR. CLARK: No questions. We'll read and
    6   sign.
    7           THE VIDEOGRAPHER: We're off the record,
    8   the time is 1:40 p.m.
    9           (Deposition adjourned at 1:40 p.m.)
   10                   * * * * *

Page 94

    1                   JURAT PAGE
    2
    3       I, RANDY BLAKE PATTERSON, I, do hereby
    4   state under oath that I have read the above and
    5   foregoing deposition in its entirety and that the
    6   same is a full, true and correct transcript of my
    7   testimony so given at said time and place, except
    8   for the corrections noted.
    9
   10   _____
   11        RANDY BLAKE PATTERSON, I
   12
   13       Subscribed and sworn to before me, the
   14   undersigned Notary Public in and for the State of
   15   Oklahoma, by said witness _____, on this
   16   the _____ day of _____, 2016.
   17
   18   _____
   19           Notary Public
   20
   21   My Commission Expires: _____
   22
   23                   KBJ

Page 95

    1   D & R Reporting & Video, Inc.
        400 North Walker, Suite 160
    2   Oklahoma City, Oklahoma 73102
        (405) 235-4106
    3   FAX (405) 235-4115
    4   Correction Sheet
    5   Witness: RANDY BLAKE PATTERSON, I  Reporter: KBJ
        Attorney: JACK DAWSON, 210 PARK AVE., STE. 2550,
    6   OKC, OK 73102          Date: 6-29-16
        OA: STEVE CLARK
    7
    8   Case Style: PATTERSON v. NBME;CIV-15-1204-HE
    9   Page Line  Correction       Reason for Correction
   10
   11  _____
   12  _____
   13  _____
   14  _____
   15  _____
   16  _____
   17  _____
   18  _____
   19  _____
   20  _____
   21  _____
   22  _____
   23  _____
   24  _____
   25  _____

Page 96

    1               CERTIFICATE
    2
        STATE OF OKLAHOMA )
    3                     ) SS:
        COUNTY OF OKLAHOMA )
    4
    5       I, Karen B. Johnson, Certified Shorthand
    6   Reporter, within and for the State of Oklahoma, do
    7   hereby certify that RANDY BLAKE PATTERSON, I was by
    8   me first duly sworn to testify the truth, the whole
    9   truth, and nothing but the truth in the case
   10   aforesaid; that the above and foregoing deposition
   11   was by me taken in shorthand and thereafter
   12   transcribed; that the same was taken on JUNE 29,
   13   2016, that the deposition was taken in OKLAHOMA
   14   CITY, State of Oklahoma; that I am not an attorney
   15   for nor a relative of any said parties or otherwise
   16   interested in the event of said action.
   17       IN WITNESS WHEREOF, I have hereunto set my
   18   hand and seal of office on this 8TH day of JULY,
   19   2016.
   20
   21
   22
   23
   24   _____
        Karen B. Johnson
   25   State of Oklahoma CSR #1376