Page 1

THE DISTRICT COURT OF OKLAHOMA COUNTY
STATE OF OKLAHOMA

RANDY BLAKE PATTERSON,          )
                                )
          Plaintiff,            )
vs.                             )
                                ) Case No. CJ-2015-5283
NATIONAL BOARD OF MEDICAL       )
EXAMINERS,                      )
                                )
          Defendant.            )

DEPOSITION OF HERMAN JONES, Ph.D.

TAKEN ON BEHALF OF THE DEFENDANT

IN OKLAHOMA CITY, OKLAHOMA

ON AUGUST 31, 2016



METROPOLITAN BUILDING            MID-CONTINENT TOWER
400 North Walker, Suite 160      401 South Boston, Suite 310
Oklahoma City, OK 73102          Tulsa, OK 74103
405-235-4106                     918-599-0507

depo@drreporting.com

REPORTING & VIDEO, INC.

REPORTED BY JILL TUCKER SHAW, CSR #1459

EXHIBIT 16

## Page 1

THE DISTRICT COURT OF OKLAHOMA COUNTY
STATE OF OKLAHOMA

RANDY BLAKE PATTERSON,          )
                                )
          Plaintiff,            )
vs.                             )
                                ) Case No. CJ-2015-5283
NATIONAL BOARD OF MEDICAL       )
EXAMINERS,                      )
                                )
          Defendant.            )

DEPOSITION OF HERMAN JONES, Ph.D.
TAKEN ON BEHALF OF THE DEFENDANT
IN OKLAHOMA CITY, OKLAHOMA
ON AUGUST 31, 2016

REPORTED BY JILL TUCKER SHAW, CSR #1459

## Page 2

APPEARANCES

FOR THE PLAINTIFF:

STEVEN E. CLARK
KATIE TEMPLETON
Attorneys at Law
Clark & Mitchell, P.C.
101 Park Avenue, Suite 210
Oklahoma City, Oklahoma 73102
(405) 235-8488
Katie@clarkmitchell.com

FOR THE DEFENDANT:
AMY ALDEN
Attorney at Law
Miller Dollarhide
210 Park Avenue, Suite 2550
Oklahoma City, Oklahoma 73102
(405) 235-8130
Aalden@millerdollarhide.com

FOR THE WITNESS:
JENNIFER NEEDHAM
Attorney at Law
OU Health Sciences Center
1105 N. Stonewall, Suite 221
Oklahoma City, Oklahoma 73117
Jennifer-needham@ouhsc.edu

## Page 3

EXAMINATION INDEX

HERMAN JONES, Ph.D.

    DIRECT BY MS. ALDEN ............ 5
    CROSS BY MS. TEMPLETON .......... 39

EXHIBIT INDEX
                                                Page
Defendant's Exhibits

1  USMLE Certified Transcript of Scores    20
2  URMP Applicant Report                   23
3  Medical Student Performance Evaluation of  27
   Randy Blake Patterson

4  Letter from Clark & Mitchell to Jack    35
   Dawson and Amy Alden dated June 24, 2016

## Page 4

STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED BY and between the parties hereto, through their respective attorneys, that the deposition of HERMAN JONES, Ph.D., may be taken on behalf of the Defendant on August 31, 2016, in Oklahoma City, Oklahoma, by Jill Tucker Shaw, Certified Shorthand Reporter for the State of Oklahoma, pursuant to Notice and agreement.

IT IS FURTHER STIPULATED AND AGREED BY and between the parties hereto, through their respective attorneys, that all objections, except as to the form of the question and responsiveness of the answer, are Reserved until the time of trial, at which time they may be made at the time of the taking of this deposition.

Herman Jones, Ph.D.                                                August 31, 2016

Page 5

1   HERMAN JONES, Ph.D.,
2   being first duly sworn, deposes and says in reply to
3   the questions propounded as follows:
4              DIRECT EXAMINATION
5   BY MS. ALDEN:
6       Q. Dr. Jones, my name is Amy Alden. It's nice
7   to meet you in person. We have visited on the phone
8   one other time, have we not?
9       A. Yes.
10      Q. Okay. Just for the record, tell me your
11  name.
12      A. Herman Jones.
13      Q. And give me your home address, please.
14      A. [redacted]
15
16      Q. And what is your business address?
17      A. I'm retired.
18      Q. Oh, okay. You know, actually, I think I
19  knew that. But you mentioned just a minute ago that
20  you were out of this and maybe back in neurology. So
21  I thought maybe you were working again.
22      A. I have to -- there has to be a 60-day laps
23  from retirement before I could reenter a contract
24  with the University. This is my 59th day.
25      Q. Oh, okay. What, if anything, did you do to

Page 6

1   prepare for your deposition today?
2       A. Nothing.
3       Q. Okay. Prior to your retirement, were you
4   affiliated with the University of Oklahoma College of
5   Medicine?
6       A. Yes. I joined faculty here in 1981 and
7   maintained faculty status until July 1st of 2016.
8       Q. And what was the last job that you had here
9   at the College of Medicine?
10      A. I was James H. Little Endowed Professor of
11  Neurology and also Professor of Psychiatry.
12      Q. Were you also the Dean of Students?
13      A. That was not my last job.
14      Q. Okay.
15      A. That was my job from 2011 to 2015. I then
16  returned to patient care and teaching.
17      Q. Okay. As part of your job here with the
18  College of Medicine, at any time was it part of your
19  job to advise medical students regarding the
20  residency match process?
21      A. Yes. It was a small portion of my duties,
22  primarily for those interested in going into
23  neurology and psychiatry before I took the position
24  of Associate Dean for Student Affairs at the College
25  of Medicine in June of 2011.

Page 7

1   After that, from 2011 until June of 2015, it
2   was a regular part of my job.
3       Q. Was it ever a part of your job
4   responsibility to evaluate prospective residency
5   candidates for the University of Oklahoma?
6       A. Yes. Probably from 1982 until my
7   retirement.
8       Q. And did you evaluate for all specialties, or
9   were there any particular specialties that you helped
10  evaluate prospective residency candidates?
11      A. Almost always, it was neurology. I also
12  evaluated -- helped evaluate out of my own home
13  department in the Department of Psychiatry and also
14  in Family Medicine.
15         MS. NEEDHAM: Amy, just before we go on any
16  further, I want to go ahead and do what I did this
17  morning.
18         MS. ALDEN: Okay.
19         MS. NEEDHAM: He is represented by counsel
20  in his employment capacity with the University, as
21  long as he's within the scope of his employment,
22  which would be his administrative or teaching duties.
23  To the extent he offers opinions, they may be his
24  personal opinions, and I don't represent him in that
25  capacity.

Page 8

1          MS. ALDEN: Okay.
2       Q. (BY MS. ALDEN) Are you okay with that,
3   Dr. Jones?
4       A. Yes, I am fine with that.
5          MS. NEEDHAM: He'd prefer I not represent
6   him at all.
7       Q. (BY MS. ALDEN) Have you ever been the
8   program director of a residency program?
9       A. No.
10      Q. As I understand it, you first met Randy
11  Blake Patterson while you were a faculty member in
12  the Neurology Department?
13      A. Yes.
14      Q. And am I correct in understanding that it
15  was -- Dr. Patterson was a student of yours in a
16  preclinical course that you were teaching?
17      A. Yes. He was, I believe, in his second year
18  of medical school. There was a course in the prior
19  curriculum called intro to pathology. And it was
20  divided into different human systems. And I was the
21  course coordinator for the neurology section at that
22  time, and so would coordinate other lectures and also
23  provide lectures.
24         And during one of those contacts,
25  Dr. Patterson came up after the class and introduced

2 (Pages 5 to 8)

Herman Jones, Ph.D.                                        August 31, 2016

**Page 13**

1   terms of Dr. Patterson's career goals?
2       A.  He expressed a desire to be, at that point
3   in time, a surgeon, to obtain a position in a
4   surgical position -- a surgical residency.
5       Q.  At what point in time would this have been?
6       A.  It would have been, I think, if I recall
7   correctly, that it was during his third year while he
8   was taking his surgery clerkship. That would have
9   been his first real experience with a surgical life.
10      Q.  In terms of his suitability for a career --
11  actually, let me go back to that prior subject.
12          Did there ever come a time when his career
13  goals changed?
14      A.  Yes.
15      Q.  Okay. Tell me about that.
16      A.  Well, after Dr. Patterson failed to obtain a
17  residency position in the main match on his first
18  go-round, we then talked about possible alternatives.
19      Q.  And what alternatives did you discuss?
20      A.  Well, the two -- the major fork in the road
21  at that point in time was he could decide not to
22  graduate, not walk with his class, and to still owe
23  two weeks of clinic experience in his fourth year
24  medical school so that he would not have graduated.
25      Q.  Right.

**Page 14**

1       A.  There would still be a lapse year. The
2   positive side of that would have been he could have
3   come back and applied for an away rotation.
4       Q.  What does that mean?
5       A.  Oh, away rotations are sub-internships,
6   fourth year experiences where a student will go and
7   audition at a particular program. For example, if I
8   thought that I wanted to be an anesthesiologist at
9   Washington University, I would apply for a two-week
10  or one-month set of experiences to go there and to
11  audition. And that's one of the criteria, is how
12  well someone does under our observation. That's one
13  of the criteria that residency program directors use
14  in preparing a rank order list.
15      Q.  And when you say an away sub-internship, you
16  are talking about away from the University of
17  Oklahoma College of Medicine?
18      A.  Yes, because they will have already
19  auditioned. They will have had some experience here
20  in the third-year clerkships.
21      Q.  Okay. What was the other alternative or
22  alternatives to delaying graduation?
23      A.  The other alternative would have been to
24  have graduated, used the upcoming year to increase
25  his viability by enrichment and involvement in

**Page 15**

1   additional training. In this case, obtaining a
2   Masters in Public Health. Also, to engage in
3   research in the specialty of his choice. To obtain
4   new letters of recommendation, and therefore possibly
5   look more attractive to residency program directors
6   the next year.
7       Q.  Did Dr. Patterson choose one of those
8   alternatives over another?
9       A.  Yes. He chose the latter.
10      Q.  So he chose to go ahead and graduate;
11  correct?
12      A.  Yes.
13      Q.  And then to attempt to increase his
14  viability as a residency candidate by certain
15  experiences that he had in that -- I think you called
16  it a lapse year?
17      A.  Yes.
18      Q.  Are you familiar with the experiences that
19  he had during that lapse year that he was using to
20  try to improve his viability as a candidate?
21      A.  Yes.
22      Q.  Tell me about what you know about those
23  experiences.
24      A.  I referred him to the Masters of Public
25  Health Program here on campus. That allowed him also

**Page 16**

1   to delay repayment of student loan debt.
2           I wrote him a letter of recommendation for
3   that program, and he was accepted. I also encouraged
4   him to participate in research activities. And it
5   was my understanding that he did so within the
6   Department of Surgery.
7       Q.  Do you know how long the Masters in Public
8   Health Program is at the University of Oklahoma?
9       A.  It is usually two semesters and a summer.
10      Q.  So something that he was capable of
11  completing in that lapse year?
12      A.  Yes.
13      Q.  Do you know whether or not he ended up
14  getting a master's degree?
15      A.  No, I don't recall.
16      Q.  If he didn't get the master's degree, would
17  that experience, in your opinion, have been something
18  that would have buffed up his viability as a
19  prospective resident?
20      A.  Can you say that --
21      Q.  If he did not actually achieve a Master's
22  degree in public health during that lapse year, is
23  that something that would have improved his
24  viability, in your view, when he went through the
25  match the second time around?

4 (Pages 13 to 16)

Page 17

A. I would defer that to individual program directors to make that decision, but would also point out that at the point in time that they're looking at his follow-up application, no one knows if he was going to graduate or not. So as you say, he's enrolled, he's scheduled to have the MPH when he starts the program, or be close around there, and that's what the program directors are going to be cognizant of when they look and consider his second application.

Q. Fair enough.

A. Good.

Q. Suitability. You said that the two of you discussed his suitability, both personally and professionally, for his career goals.

As far as being a surgeon, what sorts of discussions did you have about his personal suitability?

A. We talked about commitment to that particular specialty in terms of it is not uncommon for general surgeons to work 60, 70, 80 hours a week. And that is a huge personal commitment because other things have to be sacrificed.

I think -- my favorite story about that comes from this campus where a neurologist and a

Page 18

surgeon are walking at 6:30 at night and they're walking in the parking garage. And the neurologist turns and says, "You know, I've got to hurry home because my kid's T-ball game is tonight, and I don't want to be the kind of guy -- dad that misses my son's T-ball game." And the surgeon turns and says, "I'm that guy, because I've got to go back to the trauma center."

So surgeons have -- I know it's an overgeneralization, but they do tend to have a big commitment to that specialty. And so if you go into a surgical specialty and you become a surgeon, that is very different than being a physician, all other things being considered.

Q. Did you have any concerns about his personal suitability to become a surgeon?

A. I didn't -- I don't think -- I didn't tell him that he couldn't do that. I told him to be aware and mindful that this was a big commitment and this was going to be an uphill battle for him.

Q. What about professional suitability? What kinds of discussions did the two of you have in that regard?

A. We had discussions that there were several less than positive attributes about his appeal to

Page 19

residency program directors at that point. He did not have a strong Step 1 score. He did not have a strong class rank.

The Journal of Academic Medicine routinely publishes surveys of residency program directors of various specialties. And at that point in time, it's my recollection that the most recent one of surgical residency program directors talked about board scores, surgery shelf exam scores, personal letters of recommendation, grades, and then observed supervision. And that those were the major criteria that many -- that were important to surgery program directors.

And we talked about that in terms of that his grades, and therefore class rank, were not going to be a strong point. His Step 1 score, which measures basic sciences, basically, was not going to be a strong point for him. Therefore, he had to really enhance his viability with Step 2 scores and away rotations and letters of recommendation.

Q. Do you know how -- do you know when Dr. Patterson first sat for the Step 2 clinical knowledge component of the boards? And when we are talking about the boards, we are talking about the United States Medical Licensing --

Page 20

A. USMLE, sure.

Q. -- Exam; correct?

A. Yeah, USMLE.

No, I don't recall.

Q. Do you recall whether or not he passed the first time he took the clinical knowledge component?

A. CK. I don't recall, but I would certainly -- I've had that information in the past, but I don't -- I have not had it in front of me for review.

(Defendant's Exhibit No. 1 was marked for identification purposes.)

Q. (BY MS. ALDEN) I'll hand you what I've marked as Exhibit 1 to your deposition and ask you if this is familiar to you as a transcript that you have seen in the past -- certified transcript of scores for the United States Medical Licensing Examination?

A. Yes.

Q. And does that appear to you to be a transcript for Randy Blake Patterson?

A. Yes.

Q. I'll direct you to look down about halfway through the page -- the first page, and you'll see that it shows clinical knowledge -- USMLE Step 2 clinical knowledge. And if you'll look at December

Page 21

1  22, 2012, it shows that Dr. Patterson received a
2  failing score.
3      Is that what that appears to be to you?
4  A. Yes.
5  Q. Does that appear to you to be the first
6  time, based on this transcript, that he took that
7  component of the exam?
8  A. Yes.
9  Q. And he took that just prior to the 2013
10 match; correct?
11 A. Yes.
12 Q. Would that failing score have been a
13 negative data point for Dr. Patterson in going
14 through the 2013 match?
15 A. It would have been a challenge for a program
16 director to -- it would have been a challenge for a
17 program director to consider, yes.
18 Q. It would have been a negative data point?
19 A. Yes.
20 Q. So in terms of your suggestion to him that
21 he enhance his liability with a strong Step 2 score,
22 I think we can agree he did not do that?
23 A. Correct.
24 Q. And I have a question just because I
25 don't -- we talked a little bit about an away

Page 22

1  experience earlier.
2      When you talk about away rotations here in
3  terms of enhancing his viability, this would have
4  been before the 2013 match; correct?
5  A. Yes.
6  Q. Are you again talking about experience away
7  from the University of Oklahoma College of Medicine?
8  A. Yes.
9  Q. Okay. Do you know whether or not he was
10 able to do any away rotations as you described?
11 A. I don't recall. We could find out from his
12 transcript, but I don't recall.
13 Q. Would that be reflected in his medical
14 student performance evaluation?
15 A. No. It would be his university transcript.
16 Q. And I think I may have gotten sidetracked a
17 little bit ago. We did say at some point in time,
18 his career goals changed, but I'm not sure that you
19 ever told me what they changed to.
20 A. When he came back, he was considering
21 alternatives of specializations of anesthesiology or
22 family medicine.
23 Q. Was it ever a recommendation that you gave
24 him, prior to the 2013 match, that he consider
25 ranking programs other than surgery at that time?

Page 23

1  A. Yes.
2  Q. Do you know whether or not he did?
3  A. I don't -- no, I don't know. I don't have
4  access to their rank order list.
5  Q. I'm going to give you access to it right
6  now.
7  A. Well, yay.
8      That's an affirmative yay.
9      (Defendant's Exhibit No. 2 was marked for
10 identification purposes.)
11 Q. (BY MS. ALDEN) I want to represent to you
12 that what I have marked as Exhibit 2 to your
13 deposition is a series of documents we received from
14 the National Resident Matching Program pursuant to a
15 subpoena in this case. And looking through that, to
16 you, does that appear to be Dr. Patterson's rank
17 order list for 2013, 2014 and 2015?
18 A. Yes.
19 Q. And I'll ask you, if you look under the 2013
20 programs that Dr. Patterson ranked, do you see
21 anything other than surgery in terms of specialty?
22 A. No. And those would encompass both
23 categorical surgery as well as preliminary surgery.
24 Q. I suppose the point I'm getting at is, he
25 didn't take your advice and rank any specialty other

Page 24

1  than surgery; correct?
2  A. That's correct.
3  Q. Okay. We may have already discussed some of
4  these things in terms of talking about
5  Dr. Patterson's career goals and his suitability for
6  them, but you talked -- you testified that you also
7  had visits with him about hurdles or impediments for
8  him.
9  A. Yes.
10 Q. Tell me about those conversations.
11 A. Well, that when he did receive the failing
12 grade on Step 2 CK, we talked about how that's going
13 to be a further problem for him, that that would make
14 it -- I didn't use the term, but it's a nice term --
15 negative data point, and that this would be a further
16 challenge for him.
17 Q. For surgery residency or for any residency?
18 A. For any residency, either in the main match
19 or in the supplemental offer and acceptance program.
20 Q. You also said that you had conversations
21 about some alternatives. And again, we may be
22 covering old ground and I don't mean to. I just am
23 trying to get at whatever conversations you can
24 remember having with Dr. Patterson about alternatives
25 as you recall those conversations.

Page 25

1   A. Right. And we talked that he continued to
2   profess a desire to be a surgeon and wanting to be a
3   surgeon that first time around. And we talked about
4   how that was going to be difficult for a categorical
5   program, and that he might consider just a
6   preliminary program that's a one-year audition, and
7   that he can be picked up then sometime later in a
8   categorical program. Or that you can try to scramble
9   into something through the SOAP, Supplemental Offer
10  and Acceptance Program, in that week, although I
11  cautioned him against that, as I cautioned everybody.
12  It is uncontrolled chaos and there is no guarantee,
13  because there are so many potential physicians
14  chasing so few programs, and residency program
15  directors have sometimes only moments to minutes to
16  be able to extend an offer. And that no one wants to
17  use that as a reasonable backup plan, but sometimes
18  that's what you have to do.
19      Q. So when you say you cautioned him, I mean,
20  to me at least, it sounds like there is no risk in
21  it. I mean, if he gets an offer from somebody during
22  the SOAP, then he's got employment.
23      Is that incorrect?
24      A. That part isn't correct. That part is not
25  incorrect, but --

Page 26

1   Q. You cautioned him to have a better backup
2   plan?
3   A. Yes.
4   Q. And did you have any specific discussions
5   about what that backup plan might look like?
6   A. Yes.
7   Q. And --
8   A. Preliminary programs, rank as many different
9   programs as possible, and if not -- if that's not
10  feasible, then we prepare a plan B. And then we
11  started with the discussions about, okay, how are you
12  going to make yourself more viable if you don't get
13  anything this time.
14      Q. So it sounds to me like going into the 2013
15  match, there was a fair amount of concern that he was
16  not going to match that first time out.
17      MS. TEMPLETON: Object to the form.
18      THE WITNESS: There was concern on my part,
19  5 certainly. And I think he expressed that as well.
20      Q. (BY MS. ALDEN) Is there anything in
21  addition to what we've already discussed that you can
22  tell me about discussions that you had with him
23  regarding ways to increase his viability in the main
24  match?
25      A. No. Unless there is something in the

Page 27

1   e-mails and written documentation at that point, no,
2   nothing comes to mind.
3       Q. Do you have a recollection whether or not
4   Dr. Patterson was required to remediate any course
5   work during his medical school tenure?
6       A. I recall that he may have, but I cannot
7   recall the specifics of it.
8       (Defendant's Exhibit No. 3 was marked for
9   identification purposes.)
10      Q. (BY MS. ALDEN) I'll hand you what I've
11  marked as Exhibit 3 to your deposition.
12      Do you recognize this, Dr. Jones?
13      A. Yes, I do.
14      Q. Can you tell me what it is?
15      A. It is the Medical Student Performance
16  Evaluation for Randy Blake Patterson. It is dated
17  October 1, 2012. It appears to be a true and
18  accurate representation of my document, and it is my
19  signature at its end.
20      Q. If you'll look at Page 2 of the document,
21  under obstetrics and gynecology clerkship --
22      A. Yes.
23      Q. -- it shows that he had to remediate that --
24  I don't know if it's an internship --
25      A. Clerkship.

Page 28

1   Q. A clerkship.
2      Would that have been a negative data point
3   for programs considering him as a prospective
4   resident?
5   A. Yes.
6   Q. You may have already covered this, but I
7   believe that you had a meeting with Dr. Patterson in
8   August of 2012.
9       Does that ring a bell with you?
10  A. Yes.
11  Q. Okay. And I am under -- I have the
12  understanding that you told him he was going to have
13  a -- he was going to have to have a significant
14  improvement on his Step 2 CK to enhance his viability
15  as a prospective resident --
16  A. Yes.
17  Q. -- residency candidate.
18      At that time in August of 2012 -- and take a
19  look back at his transcript if you'd like, his USMLE
20  transcript -- he had not -- he'd only taken the Step
21  1 at the time you gave that advice.
22  A. Yes.
23  Q. So when you were telling him he needed to
24  have a significant improvement, you were talking
25  about a significant jump from the kind of poor score

### Page 29

1  that you just previously described on the Step 1 to
2  the Step 2 CK; is that right?
3  A. Yes.
4  Q. Okay.
5  A. And also to have it early enough to be able
6  to demonstrate to residency program directors that
7  that had, in fact, occurred.
8  Q. And what would have been early enough for
9  him to demonstrate to residency program directors
10 that that had occurred?
11 A. Well, they don't have to enter a final rank
12 order list until February, but they will offer
13 invitations for interviews in surgery usually in the
14 beginning of October. So the more positive
15 information that's there, the better. The caution
16 being you want him to have as good a score as
17 possible as opposed to an early score, and sometimes
18 those are mutually exclusive. That gives you less
19 time to study before you sit for the exam.
20 Q. But at the very latest, it would have been
21 important for him to have been able to demonstrate a
22 good strong score on the Step 2 CK prior to the time
23 that the programs did their own rank order lists in
24 February of 2013?
25 A. Yes.

### Page 30

1  Q. Okay. Did you ever advise Dr. Patterson
2  that he should interview well and interview often?
3  A. Yes.
4  Q. Is that something you told a lot of
5  students?
6  A. That's one of my mantras, yes.
7  Q. Sure. When you told him he should interview
8  often, did you have a number in mind?
9  A. 12 to 15 --
10 Q. So is there --
11 A. -- for surgical -- for a surgical program.
12 Q. Okay. And when you said -- told him to
13 interview well, what do you mean by that?
14 A. To be everything that would be positive to a
15 residency program director in surgery. And I
16 remember specifically with this class being --
17 uniformly saying you want to mirror good behavior,
18 you want to show them commitment to the process, you
19 want to be respectful, because those are the things
20 that residency program directors in surgery look for.
21 Q. Do residency program directors in other
22 specialties look for that too?
23 A. No, not to the same degree. I think that
24 residency program directors -- and I maintain contact
25 during this -- in addition just to having collegial

### Page 31

1  relations on OU, one of my jobs, I interpreted, was
2  to meet and groom as many different residency program
3  directors across the nation so that if they saw from
4  OU, especially during SOAP -- because the rules of
5  the supplemental offer program is I cannot reach out
6  on behalf of my students, but the residency program
7  director can reach out to me. And so I wanted as
8  many of them to reach out to me, if they knew me, so
9  that I could put a plug in for my students.
10 Q. Did Dr. Patterson --
11 A. But I'll go back.
12 Q. Okay.
13 A. I think that residency program directors in
14 psychiatry look for more self-centeredness, more
15 well-balanced and more interpersonal skills than
16 someone maybe in a surgical technique. I think that
17 there are certain residency program directors that
18 they just look for the capacity to learn, because
19 they figure I can teach you anything that you need to
20 know in three or four or seven years.
21    So I think residency program directors have
22 a variety of different things. That's one of the
23 reasons that those academic medicine articles,
24 "What do I look for in a good candidate" help us
25 with.

### Page 32

1    And then the other thing that we use is, at
2  the end of every intern year, P1, postgraduate year,
3  the University of Oklahoma sends out a survey to all
4  residency program directors: Would you take this
5  student again? Were they well prepared compared to
6  other folks? What would you do differently? And
7  there would be times when I would see residency
8  program directors say, "No, I'd never take another OU
9  student ever again." Yow.
10   So don't ever go to Knoxville.
11 Q. I am never going to apply to a residency
12 program. So no worries.
13 A. I don't know. My favorite student was the
14 one who applied and was accepted to OU Medical School
15 at the age of 56.
16 Q. I'm fairly certain I know my limitations,
17 Dr. Jones.
18 A. Unfortunately, he did not, but he graduated
19 as a doctor.
20 Q. When Dr. Patterson did not match in the main
21 residency match, did he participate in the SOAP
22 process in 2013?
23 A. You know, I don't recall. My general
24 impression was I thought that he did, but I would --
25 if he didn't, I would stand corrected.

### Page 33

1  Q. And as you mentioned, program directors are
2  permitted to contact you as the Dean of Students to
3  obtain input on a candidate?
4  A. (Witness nods head.)
5  Q. Yes?
6  A. Yes, that is correct. I didn't think you
7  were -- I didn't know if you were finished.
8  Q. I'm sorry.
9  A. That's okay.
10 Q. Did you field any calls inquiring about
11 Dr. Patterson during the 2013 SOAP process?
12 A. No.
13 Q. And you would have known if Dr. Patterson
14 was offered something through the SOAP program,
15 wouldn't you, because he would have to have accepted
16 it; correct?
17 A. No, not necessarily. I would -- I would see
18 that he had been extended an offer and -- but not
19 necessarily whether he took it or not. I've had
20 individuals who, crazily enough, didn't get anything
21 in the main match and applied for a SOAP program and
22 got a SOAP offer, and decided, no, I don't want to do
23 it.
24 Q. So with the SOAP program, it's different
25 than the residency -- the main match in that you are

### Page 34

1  not contractually obligated to take an offer that you
2  are given?
3  A. That is correct.
4  Q. Okay. You were not present for any
5  interviews that Dr. Patterson gave with any residency
6  programs, were you?
7  A. No. That would be outside the scope of what
8  I could do.
9  Q. Well, I just wasn't sure if he had
10 interviewed here at OU, if that's something you would
11 have been a party to?
12 A. He did interview here inside the Department
13 of Surgery. But as Dean of Student Affairs, I would
14 not have been privy to that. They do -- they take
15 care of their own in there. And that he would be --
16 Jason Lees would be the resident program director at
17 that time. And I do know that they gave him an
18 interview.
19 Q. Do you know anything about how the interview
20 went?
21 A. No.
22 Q. So it's fair to say you don't know if he
23 interviewed well or not?
24 A. Correct. I do remember that he interviewed.
25 But other than that, that's all I know.

### Page 35

1  (Defendant's Exhibit No. 4 was marked for
2  identification purposes.)
3  Q. (BY MS. ALDEN) Dr. Jones, I have handed you
4  what I've marked as Exhibit 4 to your deposition.
5  And I will represent to you that this is a
6  lawyer that Dr. -- not -- I'm sorry. Not a lawyer.
7  It's a letter that Dr. Patterson's lawyers provided
8  to us in this case lining out the testimony that they
9  expect that you and another physician will give in
10 this case as non retained experts. And so I want to
11 ask you about some of those opinions that we've been
12 told you are going to give.
13 A. Okay.
14 Q. And would you like to take a minute to look
15 at it?
16 A. I would.
17 Q. Go ahead.
18 MS. TEMPLETON: Can we take, like, a
19 two-minute break?
20 MS. ALDEN: Sure.
21 (Brief recess taken at 2:22 p.m.; deposition
22 resumed at 2:24 p.m.)
23 Q. (BY MS. ALDEN) Dr. Jones, we're back on the
24 record. And I know you've done this a time or two.
25 So you know that you're still under oath?

### Page 36

1  A. Yes.
2  Q. Have you had an opportunity to review what
3  I've marked as Exhibit 4?
4  A. Yes.
5  Q. Okay. I will call your attention to -- I
6  guess it would be the last paragraph on the first
7  page. It states, "Dr. Jones will testify that Randy
8  Blake Patterson likely would have received a match
9  at a mid-level program had he not had a gap year and
10 been delayed, though probably not in his first
11 choice -- surgery."
12 Is that an opinion that you plan to give at
13 the trial of this matter?
14 A. No.
15 Q. Okay. Is that an opinion that you avow?
16 A. No.
17 Q. Okay. The second page I'll call your
18 attention to, the first full paragraph. It says that
19 you will testify, "Approximately 85 to 90 percent of
20 OU graduates match into a residency program. It is
21 common knowledge in the residency training programs
22 in the U.S. that a gap year is detrimental to
23 subsequent applications unless the student was
24 involved in something that enhances his
25 attractiveness to a residency program such as a

Herman Jones, Ph.D.                                                        August 31, 2016

Page 37

1  series research endeavor. The only one-year graduate
2  program at OU is a Masters of Public Health, which
3  Dr. Patterson obtained. This did not prove to
4  enhance his attractiveness to technically driven
5  specialties and he likely did not obtain a match due
6  to his gap year."
7         Is that -- to the extent that it's an
8  opinion, to the extent it is factual information --
9  well, let me strike that.
10        To the extent that there's an opinion in
11 there, is that an opinion you intend to offer at the
12 trial of this matter?
13     A. No, that's not my opinion.
14     Q. Do you intend to offer any opinions about
15 whether and to what extent Randy Patterson was
16 damaged as a result of the allegations that form the
17 basis of this lawsuit?
18     A. In terms of that he was not given -- if I
19 may, that he was not given access to a Step 2 CS in
20 time for --
21     Q. Correct.
22     A. Okay. So I believe that that was a negative
23 data point, but I am unable to directly link that to
24 the fact that he did not get a position. I think
25 that there are several other factors at play. I was

Page 38

1  not present during many of the other experiences that
2  could have enhanced his viability, how well he
3  interviewed, those types of things, the stuff that
4  we -- the things that we have talked about before.
5         So I cannot link that particular thing to
6  that. And it's been my experience, off-cycle
7  graduates, e.g. gap years, are not always negative.
8  And probably I can give you this statistic -- and I
9  know there's lies, damn lies -- statistics in
10 accounting. But almost one-half of Stanford Medical
11 School graduates have gap years, but they take those
12 gap years and do research so they are published
13 authors when they come through whatever match they
14 wish.
15        So being off cycle raises a red flag, but
16 does not always cause to be the single factor that
17 prohibits someone from obtaining a residency.
18     Q. And so you are not going to give an opinion
19 to the effect that Dr. Patterson's inability to
20 retake the Step 2 clinical skills exam any sooner
21 than he did was a cause of him having a gap year or a
22 failure to match?
23     A. I -- to be clear, I will not offer that
24 opinion. I will point it out as a negative data
25 point, but it is not my opinion that that is the

Page 39

1  single thing that caused this to occur.
2     Q. With respect to the second full paragraph on
3  page 2 of Exhibit 4, "The USMLE CS2 exam" -- and by
4  that, we're talking about the Step 2 clinical skills;
5  correct?
6     A. Yes.
7     Q. " -- has been controversial since its
8  inception. The CS2 has a failure rate of 4 to 5
9  percent nationally, and studies have shown that those
10 who fail suffer a $1,000,000 financial detriment as a
11 result."
12        What research did you do to -- first of all,
13 let me ask you. Is that your opinion?
14     A. No.
15        MS. ALDEN: Okay. Fair enough. I won't ask
16 any more questions about it.
17        I don't think I have any further questions
18 right now.
19        THE WITNESS: There's always rebuttal.
20             CROSS EXAMINATION
21 BY MS. TEMPLETON:
22     Q. Dr. Jones, I just have a few questions for
23 you.
24        Although you have stated that you will not
25 necessarily be offering this testimony at the time of

Page 40

1  trial, you and I spoke on the phone; is that correct?
2     A. Yes.
3     Q. During that phone conversation, you stated
4  to me the information contained in the paragraph that
5  Ms. Alden just referenced that there are studies that
6  have indicated that there are damages up to
7  $1,000,000 with regard to failing the CS2 exam and
8  that which ensues.
9         Do you recall that part of our
10 conversations?
11     A. No. The only recollection I have about CS2
12 and $1,000,000 was from an article from the Journal
13 of Academic Medicine in which it was pointed out that
14 it took up to $1,000,000 in fees in order to discern
15 a single failure on Step 2 CS.
16     Q. Could you explain that further to me?
17     A. Certainly. Let's just say -- I don't know
18 what it was at the time. Let's just say that my
19 going and taking Step 2 CS, the fee is going to be,
20 say, $1,600. And I'm going to also have to go travel
21 to one of seven centers. And that Step 2 CS, if you
22 look at how much money is extended by those
23 applicants, that it's about $1,000,000 in expenses to
24 those people taking the examination for every
25 failure.

Page 41

Q. Okay. Thank you.
A. But if there's -- I don't know of any way -- I don't know of any way to be able to say how much money a Step 2 CS failure really provides. I've had several experiences where I've had people who take Step 2 CS, fail it, and still get into highly regarded surgical residency programs.

I guess my favorite story is -- I believe it was out of this class. A person takes his integrated clinical encounter and fails it. He gets his failing score. I bring him in. I go, "What happened?" All of our efforts to make sure that you were fine, they take -- all of our medical students take an end of third year Objective Structure Clinical Encounter, OSCE, that mimics as close as we can Step 2 CS to provide them that kind of experience.

So I look back at this guy's scores. He did fine. And I said, "What happened?" He said, "I was in and out of there in each one of those sessions in seven minutes."

And I said, "Stupid fool." I said, "You didn't demonstrate any empathy. You didn't use enough time." And he goes, "Oh, empathy. I can fake that."

He's going to be a fine surgeon.

Page 42

Q. Sir, also in our conversation when we were discussing the Masters of Public Health and kind of what to do to make yourself look better in a gap year --
A. Yes.
Q. -- my notes reflect from our conversation that you had told me about a Masters of Science Program, much like an LLM for lawyers, that Tulane offers that's a one-year program, but more of a technically driven field, so to speak, or program, and that that would be something that might -- or would more likely make you enticing or --
A. Viable.
Q. -- viable with the more technical specialties, such as surgery, anesthesia, those sorts of things.

Did you, during this conversation, also tell me that the Masters of Public Health is helpful in the less technical specialties such as family practice, pediatrics, those sorts of things?
A. Yes, I did mention that, although I would hesitate to use the word technical, and would insert the word procedural.
Q. Okay. That's fair.
A. And so, yes, the Masters of Public Health

Page 43

was a viable option, all the time knowing that I recommended to Dr. Patterson that at the same time he involves himself with activities and research in those areas with which he's interested, because the viability in ascending area is involved in research, involved in research that's published, involved in research publication as an author.

So those -- I'm a residency program director. I see he's done some work with Bill Dooley. Bill Dooley is big in intraductal lavage for in situ brain -- excuse me, breast cancer. And if something had come from that and he got published, I think that would have been a very viable point.
Q. **And he did participate in other surgery research projects during that year; true?**
A. Surgical --
MS. ALDEN: Object to the form.
Go ahead.
THE WITNESS: Surgical. I believe he did a pediatric otorhinolaryngology. That's a surgical technique. And, you know, residency program directors have told me over the years that they tend to look at particular experiences more than others.

For example, if I'm a procedurally based program director, e.g., surgery, I'm going to look

Page 44

at, okay, how did they do on surgery? How did they do if they took an anesthesia -- because it's still in the OR, just the other side of the tent -- OB-GYN, because OB-GYNs are the only specialty that refers to themselves both as a physician and as a surgeon. So they tend to look at those more. They probably would not pay a lot of interest in how well they did in Psych.

So, yeah, residency program directors have different biases.
Q. **Do you recall during our conversation that you told me if you have a gap year and you do something good, such as research for advanced training, that's helpful? If you have a gap year and you don't fill that, that's harmful?**
A. Yes, those are my words.
MS. TEMPLETON: Those are all the questions I have.
MS. ALDEN: I don't have any further questions.

We do need to make a little bit more of a record. Just -- I know you know this, Dr. Jones, but you have the right to read and sign your deposition. You need to let the court reporter know on the record what your decision is in that regard.

11 (Pages 41 to 44)

Page 45

1　　　THE WITNESS: After thoughtful reflection, I
2　will waive that responsibility.
3　　　(Signature waived; witness excused;
4　deposition concluded at 2:40 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 46

1　　　　　　　　CERTIFICATE
2　STATE OF OKLAHOMA　)
　　　　　　　　　　　) SS:
3　COUNTY OF OKLAHOMA )
4　　　I, JILL TUCKER SHAW, C.S.R. for the State of
5　Oklahoma, certify that HERMAN JONES, Ph.D., was by me
6　sworn to testify the truth; that the deposition was
7　taken by me in stenotype and thereafter transcribed
8　and is a true and correct transcript of the testimony
9　of the witness; that the deposition was taken on
10　August 31, 2016, in Oklahoma City, Oklahoma; that I
11　am not an attorney for or a relative of either party,
12　or otherwise interested in this action.
13　　　Witness my hand and seal of office on this,
14　the 6th day of September, 2016.
15

16　　　_____
　　　　JILL TUCKER SHAW, C.S.R.
　　　　Oklahoma Certified Shorthand Reporter
17　　　Certificate No. 01459
　　　　Expiration Date: December 31, 2016
18
19
20
21
22
23
24
25